## PENNSYLVANIA.

Lancaster District, MAY TERM, 1817.

1817.

*Lancaster.*

*Monday,*
May 19.

Moore *against* Houston.

In Error.

3sr169
184   160

3 SR 169
25 SC ⁵209

THIS was a writ of error to the Common Pleas of *Lan-caster* county, which was heard at a special session of this courts martial, of drafted militia, who should refuse or neglect to march to the place of rendezvous, agreeably to the orders of the Governor, founded on requisitions of the president of the United States.

The legislature had a right to pass a law for trial by

Such court martial cannot be organised by the sole authority of the Governor, by virtue of the act of Congress of the 28th February, 1795, without an act of assembly to authorise it.

The deputy marshal is *justified* in executing the process of such court martial, authorised by an act of assembly. *Query*, whether he could be *compelled* to execute it?

Where the states are prohibited expressly by the constitution of the United States, from the exercise of power, all their power ceased from the adoption thereof; but where the power of the state is taken away by implication, they may continue to act until the United States exclude them.

The authority of the state does not cease, in the latter case, where Congress have legislated partially, on a subject over which they might exercise exclusive power.

Courts have power to declare an act of assembly void, but it ought to be exercised only in a very clear case.

Where fines are inflicted for breach of militia duty, the delinquent has not a right to trial by jury.

By the word *month*, in an act of assembly, a calender month is intended.

An entry of an appointment by the Governor, made in the register kept by the Secretary of the Commonwealth, is good evidence of such appointment.

A class list and inspection roll signed and affirmed to by a captain, and returned by him, is good evidence, when he has left his abode, and cannot be found after diligent search.

Though an act of assembly repeals a former act, yet if, from the whole view of it, it is evident, that the legislature intended certain parts of the former act to have a temporary continuance, it is not an immediate repeal as to such parts.

The 25th section of the act of 28th March, 1814, appears to be confined to preventing writs of *certiorari* and removal of the proceedings of courts martial, but does not operate to prevent an inquiry into the jurisdiction of such courts.

Vol. III.—Y

1817.       Court, held by virtue of an act of assembly passed for that
            purpose, in *March* last, and decided at this Term.
MOORE
*v.*
HOUSTON.
                The case was very fully argued by *M. C. Rogers, C. J.
            Ingersoll,* district attorney of the *United States, Ellmaker,*
            attorney general, and *Duncan,* on behalf of the plaintiff in
            error; and *Hopkins,* for the defendant in error.   But, as the
            opinions of the Judges contain a minute detail of the facts
            and principles involved in the decision, and as a report of the
            arguments would extend to a very inconvenient length, it has
            been thought preferable to omit them.

                TILGHMAN C. J.  This is an action of trespass for break-
            ing and entering the plaintiff's store, and taking his goods,
            &c.; brought by *Robert W. Houston,* the defendant in error,
            against *Daniel Moore,* deputy marshal, the plaintiff in error,
            general *John Dicks* and others, members of a court martial,
            by whom the said *Houston* was tried, and sentenced to pay a
            fine of ninety-six dollars, *Molton C. Rogers,* the judge ad-
            vocate, and *Nathaniel W. Sample,* brigade inspector of mili-
            tia.   The defendants pleaded *not guilty,* with leave to give
            the special matter in evidence ; on which issue was joined.
            They also put in two special pleas in justification, in sub-
            stance as follows : that *John Dicks, John M'Clure, James
            Ankrim, John Hamilton, John Clark, John Andrews, James
            Boyd, George Bietz, John Dixon, George White, John Clem-
            son,* and *Joseph Wallace,* militia officers of *Pennsylvania,*
            were appointed to hold a court martial for the trial of all such
            persons within the bounds of the 2d brigade of the 4th divi-
            sion of the *Pennsylvania* militia, as had been lawfully order-
            ed into the military service of the *United States,* by the ge-
            neral orders of the Governor of the Commonwealth, as com-
            mander in chief of the militia, issued on the 26th *August,*
            1814, in pursuance of a requisition of the President of the
            *United States,* dated the 4th *July,* 1814, and had refused
            or neglected to obey such orders, or to perform the duties re-
            quired of them.   That this court martial had been summon-
            ed by *Nathaniel W. Sample,* jun. inspector of the 2d brigade,
            4th division, *Pennsylvania* militia, in pursuance of orders is-
            sued to him by the Governor, on the 22d *December,* 1814 ;
            that the said court convened on the 13th *February,* 1815, and,
            after being duly organised, appointed *John Dicks* their pre-

sident, and *Molton C. Rogers*, esq. their judge advocate.
That they then proceeded to business, and adjourned, from
day to day, until the 25th *February*, 1815; on which day a
charge was exhibited against *Robert W. Houston*, the plaintiff
in this cause, for disobedience of orders: that is to say,
" For that, when he was ordered to march to *Yorktown*, in
" the county of *York*, the place of rendezvous, by general
" orders of the 26th *August*, 1814, from the Governor of the
" state of *Pennsylvania*, in pursuance of a requisition of the
" President of the *United States* for a detachment of the
" militia of the state of *Pennsylvania*, he did not perform
" the said duty; nor did he procure a sufficient substitute to
" perform the same, nor did he, at any time, comply with the
" said requisition;" that, having notice of this charge, and
having attended before the Court, he pleaded that he was
not guilty; that the Court, having competent jurisdiction to
take cognisance of the offence, and to try and determine the
same, did, as such Court, and not otherwise, after having
due proof that the plaintiff was legally drafted and ordered
to march, that he had notice of it, and had neglected or re-
fused to obey such order, or to find a sufficient substitute,
declare him guilty, and did adjudge and sentence him to
pay a fine of ninety-six dollars to the *United States;* that
the record of the proceedings of the Court having been, in
due form of law, transmitted to the Governor, he approved
of the sentence, on the 3d *April*, 1815; that the record of
the proceedings of the Court, so approved, was in due form
of law certified by General *John Dicks*, the presiding officer
of the Court, to *John Smith*, esq. marshal of the *United States*
for the district of *Pennsylvania*, and a copy of the list of
fines assessed and approved, was, in due form of law, certi-
fied by General *Dicks* to the comptroller of the treasury of
the *United States*, and to *John Smith*, esq. the marshal; and
that *Daniel Moore*, having been appointed by *John Smith*,
esq. as his deputy for the county of *Lancaster*, proceeded to
levy and collect these fines, together with the costs, agreeably
to the act of Congress of the 28th *February*, 1795; and that
this is the trespass complained of.

    To the pleas in justification there was the general replica-
tion, *de injuria sua propria absque tali causa*, on which issue
was also joined.

On the trial of the cause, the defendants gave in evidence, the establishment of the 10th *United States* military district, under the command of general *Winder*, on the 2d of *July*, 1814; letters from general *Armstrong* to general *Winder*, dated the 2d, 12th, and 18th *July*, 1814; the requisition of the President of the *United States*, to the Governor of *Pennsylvania*, dated the 6th, 8th, 17th, and 18th of *August*, 1814; the general orders of the Governor, directed to the adjutant general of *Pennsylvania*, of the 26th *August*, 1814 ; the adjutant general's order of the same date, to the several brigade inspectors, (among others to *Nathaniel W. Sample*, jun.) to have prepared for marching, and to have marched to *York*, on the 5th of *September* ensuing, the quota of the militia of each brigade, which they were ordered to have detached and organised by a general order of the 22d *July* previous ; with a letter or memorandum of *Nathaniel B. Boileau*, esq., aid-de-camp of the Governor, subjoined to it ; and the several commissions to *Nathaniel W. Sample* jun., of the 3d *August*, 1811, and the 4th *July*, 1814, as brigade inspector of the 2d brigade, 4th division, of the *Pennsylvania* militia.

After which, the defendants offered the following evidence, viz.

1. A requisition from *William Eustis*, secretary of war of the *United States*, on his excellency *Simon Snyder* esq., Governor of *Pennsylvania*, dated the 15th *April*, 1812, requesting him to have 14000 men, *Pennsylvania* militia, (being the State's quota,) duly organised, within the shortest period that circumstances would permit; but that they should not be considered as in actual service, until by subsequent orders, they should be directed to take the field. *Prout*, the original paper from the archives of the State, to be proved by the Secretary of the Commonwealth.

2. The general order of the Governor, dated 12th *May*, 1812, founded on the last mentioned requisition, to *William Reed*, adjutant general, and the order of the same date, from *William Reed*, adjutant general, to *Nathaniel W. Sample*, jun. inspector of the 2d brigade, 4th division, *Pennsylvania* militia, to have the quota of militia in his brigade, drafted and organised, &c. *Prout*, the original paper here produced, and the original record from the secretary's office, and the original book of executive minutes, here produced ; and proof by the Secretary of the Commonwealth, that it is the register of

appointments, made by the Governor, and that *William Reed* was duly appointed and commissioned adjutant general, and that the original commissions are never recorded; and that the same *William Reed*, died in the county of *Westmoreland*, in *June*, 1814.

3. The class list and inspection roll, of all persons subject to military duty, within the bounds of *Jacob Hoon*'s company, 34th regiment, *John Dicks*, lieutenant colonel commandant, 2d brigade, 4th division, *Lancaster* county militia, signed *Jacob Hoon*, captain, and affirmed to before *Israel Loyd*, esq., 13th *May*, 1812. And also a similar class list, &c. affirmed to before *Nathaniel W. Sample*, jun. brigade inspector, the 12th *May*, 1813. *Prout*, the two papers from the brigade inspector's office here produced. And also evidence, that *Jacob Hoon* was, under the militia law of 1807, commissioned captain of the 6th company, 34th regiment, 2d brigade, 4th division. *Prout*, the entry in the original books, from the Secretary of the Commonwealth's office, now produced, and a *certificate of the Secretary of the Commonwealth under the State seal*, of his having been duly commissioned, and evidence that the said captain *Hoon* has left this county, and that after the most diligent inquiry, his present place of residence cannot be ascertained.

4. A muster roll of the volunteers and drafted men, within the bounds of the 2d brigade, 4th division, *Pennsylvania* militia, (officers included,) signed *Nathaniel W. Sample*, jun., brigade inspector, dated 6th *July*, 1812, with the indorsement thereon, of the then adjutant general *William Reed*, as received by him, on the 17th *July*, 1812. *Prout*, the original here produced with evidence, that the indorsements thereon, are in the hand-writing of *William Reed*, adjutant general, and a certified copy thereof, certified by *William N. Irvine*, adjutant general, and evidence, that he is adjutant general, as per original minutes of appointment in No. 2, and evidence, that the copy produced, is a copy compared with the original, and that the original was delivered into the hands of the witness, by the present adjutant general *William N. Irvine*.

5. Proof, that *William Reed*, was appointed adjutant general of *Pennsylvania*, on the third day of *August*, 1811, and was duly commissioned, and gave bond according to law, and continued to be adjutant general until his death, in *June*,

1814. *Prout*, the original book of appointments, as in No. 2, and the proof there mentioned of his death, &c. and his official bond here produced. And that *John M. Hyneman*, was appointed adjutant general of *Pennsylvania*, on the 10th *June*, 1814, and was duly commissioned, and gave bond according to law, and continued to be adjutant general until his death, in the month of *March* or *April*, 1816. *Prout*, the papers last stated, and some evidence of his death, &c.

6. The circular of the Secretary of the Commonwealth, dated, 22d *December*, 1814, to *Nathaniel W. Sample*, jun., brigade inspector, (whose commission had been already in evidence,) calling, by direction of the Governor, his attention to the 21st section of the militia law of 28th *March*, 1814; the third paragraph whereof, made it his duty to summon courts martial, for the trial of delinquents and deserters, or- dered into service by any general orders, predicated on a requisition by the President of the *United States*. *Prout*, the original circular to major *Sample*, and a certified copy thereof, under seal of State, and the original record thereof here produced, from the Secretary of the Commonwealth's office.

7. That the present defendants, except *Daniel Moore*, who is the deputy of the marshal of the *United States*, for the district of *Pennsylvania*, *Molton C. Rogers*, who was the judge advocate, and *Nathaniel W. Sample* jun. who was the brigade inspector, were summoned by *Nathaniel W. Sample* jun., brigade inspector, as members of a court martial; that they were all militia officers, holding commissions from the Governor of the Commonwealth. *Prout*, the commissions and summons produced, with evidence that similar sum- monses were made out for, and received by, each of the mem- bers of the court martial; and that they are now lost, or not to be found.

8. That the said court martial agreeably to notice, met on Monday, 13th *February*, 1815, organised and appointed their president and judge advocate, and adjourned from day to day, until 25th *February*, 1815. On which day, the plain- tiff, *Robert W. Houston*, appeared before the court, and a charge was exhibited against him for disobedience of orders, &c. *Prout*, the charges and specifications. That the said plaintiff, put in the plea of not guilty; and under this, gave as a reason why he was not guilty, that he had elsewhere performed a tour of militia duty; admitted that he was an

enrolled militia man ; that he was duly classed in that class of militia ordered to march by the general orders of the 26th *August*, 1814 ; that he had notice to attend at the place of rendezvous ; that he had notice to march ; that he did not march ; and requiring no proof to be exhibited to the court martial of his enrolment, of his classification, of notice to attend at the place of rendezvous, or to march ; of his neglect to march ; of his notice to appear before the court martial, that the said court martial passed sentence on the plaintiff, the said *Robert W. Houston;* that the sentence so passed, was transmitted to the Governor, and by him approved of. *Prout,* the specifications and charges, and sentence, and the approval of the Governor here produced, and the minutes of the proceedings of the court martial.

9. That the same sentence approved of, and the list of delinquents, were transmitted to the comptroller of the treasury of the *United States*, and a copy thereof to the deputy marshal. *Prout,* the originals here produced, and proof that they are originals.

10. That *Molton C. Rogers,* one of the defendants, was duly appointed judge advocate of the said court martial, and acted as such at the time the sentence was passed against the plaintiff, the said *Robert W. Houston. Prout,* the minutes of the court martial, *ut supra.*

11. That *Daniel Moore,* another of the defendants, is the deputy of the marshal of the *United States*, for the *Pennsylvania* district. *Prout,* the commissions of the marshal and deputy marshal.

The whole of this evidence was rejected by the Court, and their opinion was excepted to by the counsel for the defendants. The jury found for the plaintiff against *Daniel Moore,* and in favour of all the other defendants.

If the question were simply, whether the judgment of the Court of Common Pleas should be reversed or affirmed, there would be little difficulty in deciding it. If any of the rejected evidence was competent, the judgment cannot stand. And, without doubt, part of it was competent, because it was in direct proof of the defendant's plea, and therefore admissible, whether it was matter sufficient, in law, to bar the plaintiff's action or not. If the plaintiff thought it insufficient to bar him, he might have demurred ; but, having joined issue, he cannot prevent that from going to the jury which tends to

prove the issue on the part of the defendant. But the bare reversal of the judgment would not answer the expectations, or satisfy the wishes, of the public. Several important questions were discussed, both on the trial below and on the argument in this Court. These questions would occur again, should the cause be sent down for another trial. It is proper, therefore, that the opinion of this Court should be declared now, in order that as little as possible may be left for dispute in future.

The great question is, whether the legislature of *Pennsylvania* had a right to make a law for trial, by court martial, of persons who had disobeyed the orders of the President of the *United States* for calling out the militia, issued through the medium of the Governor. And if the legislature had such right, several subordinate points will arise, on the construction of our acts of assembly.

Before I consider the power of the legislature, it will be proper to take notice of the case of *Bolton*, decided by this Court, on a *habeas corpus*, at *Pittsburgh*, *September* Term, 1815, and relied on by the counsel for the plaintiff.(a)  That

(a) The case of *The Commonwealth* (on the petition of *Everard Bolton*,) against *William B. Irish*, deputy marshal of the district of *Pennsylvania*, was decided by the Supreme Court for the Western District, at *September* Term, 1815; present, C. J. TILGHMAN and Judge BRACKENRIDGE. The opinion of the Court, delivered by TILGHMAN C. J. was, in substance, as follows:—

By the return to this *habeas corpus*, and the evidence produced to the Court, it appears, that *Everard Bolton*, being a private in captain *Clark*'s company, in the 19th regiment of *Pennsylvania* militia, was drafted, in pursuance of general orders of the Governor, dated the 5th *September*, 1812. On the 31st *March*, 1814, he was found guilty of delinquency, in not marching according to orders, by a court martial held in pursuance of general orders of the Governor, dated the 29th *October*, 1812, and sentenced to pay a fine of $ 60, or undergo an imprisonment for 12 calender months. The sentence was approved by the Governor, and *Bolton* was arrested by virtue of a warrant issued by the president of the court, directed to the marshal of *Pennsylvania* or his deputy, no goods or chattels having been found, on which the fine could be levied. *Bolton* petitions to be discharged from imprisonment, because the court which convicted him, acting under the authority of the state of *Pennsylvania*, and not of the *United States*, had no jurisdiction in his case.

By the constitution of the *United States*, the Congress have power " to provide " for calling forth the militia to execute the laws of the union, suppress insurrections, " and repel invasions." By virtue of this power, Congress may make laws, to enforce the call; they may inflict penalties for disobedience, and erect courts for trial of offenders. And they have exercised those powers. By the act of 28th *February*, 1795, (sect. 1.) the President of the *United States* is authorised, in case of invasion, or imminent danger of invasion, to call forth such number of militia as he may judge necessary; and to issue his orders to such officer or officers of the militia, as he may think proper. By the 4th section of this act, the militia employed in the

case was essentially different from the present. *That* court
martial had no act of assembly to rest on, but depended solely
on the authority of the Governor, who ordered it to be called

1817.

MOORE
*v.*
HOUSTON.

service of the *United States,* are subject to the same rules and articles of war, as the troops of the *United States.* By the 5th section, every officer, non-commissioned officer, and private of the militia, who shall fail to obey the orders of the President of the *United States in any of the cases before recited,* shall forfeit and pay a sum not exceeding one year's pay, and not less than one month's pay, *to be determined and assessed by a court martial,* and be liable to be imprisoned, by a like sentence, on failure of payment of the fine, one calendar month for every five dollars of the said fines. And by the 6th section, courts martial for the trial of the militia, shall be composed of militia officers only. By the act of 18th *April,* 1812, the President was authorised to require of the executives of the several states, to organise and arm 100,000 of the militia, and to call into actual service, any part, or the whole of them, in all the exigencies mentioned in the constitution; and the officers, non-commissioned officers, musicians, and privates, were made subject to the penalties of the before-mentioned act of the 28th *February,* 1795. Whatever orders were given by the Governor, respecting the militia called for by the President, must be considered as given in pursuance of the call of the President; and the breach of these orders was consequently a breach of the orders of the President, and falls within the provisions of the act of 28th *February,* 1795. The question then is, how is that act to be construed, when it speaks of *the sentence of a court martial ?* The object of the act, being, to provide for the exercise of a power vested in Congress by the constitution, it must be supposed, unless the contrary is expressed, that every thing directed to be done, was to be under the authority of the *United States.* Where a court martial then is mentioned, in general terms, the most reasonable construction is, that it was to be a court under the authority of the President. The provision in the 6th section, that the court shall be composed *of militia officers only,* shews, that a court under *state authority* was not intended ; for in such case, the provision would be nugatory, as a State could pretend to no authority to constitute a court martial *of any other than militia officers.* It appears, therefore, that the courts martial intended by the act of Congress were to be held under the authority of the President. But it has been contended, that the Governor, by his own authority, as commander in chief of the militia, might order a court martial for the trial of persons who have disobeyed *his orders.* In answer to this, it is to be observed, that the Governor issued his orders for calling out the militia, expressly at the request of the President of the *United States;* so that it is, in truth, the order of the President communicated through the Governor. It is to be remembered too, that by the constitution of *Pennsylvania,* the Governor ceases to be the commander in chief of the militia, when they are called into the actual service of the *United States.* This provision was necessary, because, by the constitution of the *United States,* (art. 2. sect. 2.) " the President is commander in chief of the army and navy of the *United States,* " and *of the militia of the several states,* when called into the actual service of the " *United States.*" Besides, I know of no law of the state of *Pennsylvania,* which authorised the Governor to hold courts martial for the trial of offences like the present, at the time of his issuing the general orders in question. But it has been contended, that although the Governor might have had no authority to hold courts martial *as commander in chief of the militia,* yet he was still *commander of the militia* in the service of the *United States,* and, as such, might order a court martial under a law of the *United States.* And in proof of this construction of the constitution, have been cited the cases of the Governors of *Pennsylvania* and *New Jersey,* who commanded their militia in person, at the time of the insurrection of 1794, and of the Governors of *Kentucky* and *Ohio,* who took the field and retained the command of their militia in the late war. What passed between the President of the *United*

1817.

MOORE
v.
HOUSTON.

before the making of the act on which the proceedings in this case are founded. No allusion to the act of assembly was made by the counsel on either side, in the argument of *Bolton*'s case; nor was it in the mind of the Court, when the cause was decided; because, although then in being, it had no bearing on the law. The single question was, whether the Governor had power to call a court martial, by virtue of the act of congress of the 28th *February*, 1795. It appeared to the Court that he had not. On this point I have found no cause for changing my opinion; nor shall I be inclined to change it, until the Supreme Court of the *United States* shall decide to the contrary. The opinion of Ch. J. MARSHALL, in *Meade*'s case, has likewise been cited. Nothing falls without weight from such high authority. But there, as in *Bolton*'s case, it is evident that there was *no decision upon the validity of an act of assembly.*

One word upon the power of Courts of Justice to declare an act of assembly or an act of Congress void. This is a matter which has been so much discussed, that every man must have made up his mind upon it. I have no doubt of the *power;* nor, at the same time, have I any doubt of the impropriety of exercising it in any but *a very clear case.* These are principles which I consider as well established by the great mass of opinion, at the bar, on the bench, and in the legislative assemblies of the *United States.*

The power of the several states to govern their own militia is not derived from the constitution of the *United States.* They had it before the adoption of that constitution, and possess it still, except where it has been restricted, or yielded to the *United States.* But it does not always follow, that the

*States* and those Governors, or by what authority they exercised their commands, or what rank they held in the army of the *United States*, I am not informed, nor is it necessary to make a question of it on the present occasion, as the Governor of *Pennsylvania* did not take the field, but remained in the exercise of his authority at home, while the militia marched under the command of inferior officers. Now it will not be pretended, that the President of the *United States* ordered the Governor, or had power to order him into actual service. The sovereignty of the State puts him above such an order. He remains *commander in chief of all the militia not in the actual service of the United States*, and has civil duties of so important a nature, as may render his presence at the seat of government indispensible. Consequently the Governor, not being in the service of the *United States*, could not issue any order as an officer of the *United States*.

On no ground then, which has been taken, or can be taken, are the proceedings of this court martial to be supported. It is, therefore, the opinion of the Court, that *Everard Bolton* was unlawfully imprisoned, and should be discharged.

States have relinquished their own powers, because they have
granted similar powers to the *United States.* When they
gave Congress the power of *levying taxes,* they did not di-
vest themselves of the same power. They retain their pow-
ers, unless they are expressly deprived of them, or they have
vested such powers in Congress as are, in their own nature,
incompatible with the exercise of the same power by themselves. The prohibition to emit bills of credit is an instance
of the former—and the latter is exemplified in the power
given to Congress to establish uniform laws, on the subject
of bankruptcy, throughout the *United States.* But there is
this difference in the two cases : when the prohibition is *express,* all power of the States ceased immediately on the
adoption of the constitution; but where the authority of the
States is taken away *by implication,* they may continue to act
until the *United States* exercise their power ; because, until
such exercise, there can be no incompatibility. The subject
of a *State bankrupt law* came very lately before this Court,
in the case of *The Farmers' and Mechanics' Bank* v. *Smith ;*
and it was decided that the law of *Pennsylvania* was valid,
because the *United States* had no existing law on the subject.
It is true that, on this point, there is a diversity of opinion
among persons of great authority. Judge WASHINGTON
holds the law contrary to our decision ; but we are supported
by the recent judgment of Judge LIVINGSTON, in the case
of *Adams* v. *Story,* in the Circuit Court of *New York.* The
question is of great importance, and will ultimately be decided by the Supreme Court of the *United States.* In the
mean time, we must preserve consistency by adhering to our
own decisions.

But the case before us is somewhat different from any that
I have mentioned. Congress has a right " *to provide for*
" *calling forth the militia ;*" and they have exercised it by
the acts of 28th *February,* 1795, and 18th *April,* 1814. They
have also the power of providing for the " governing such
" part of the militia as may be employed in the service of
" the *United States,* reserving to the States respectively the
" appointment of the officers, and the authority of training
" the militia, according to the discipline prescribed by Con-
" gress." But we must distinguish between these two pow-
ers. *Calling the militia forth,* is one thing—*governing them,
when they are in actual service,* is another. It would be dif-

ficult for a State to pass a law, affecting the militia, while in the *actual service* of the United *States*, without interfering with the authority of the *United States;* and if there be any collision, the State must give way. But when a State law is to operate on the militia, *before they are in actual service*, it may not only not interfere with the law of Congress, but have a powerful effect in aid of it. For instance, the object being to carry the militia to the field, Congress may inflict a penalty on all those who disobey the call of the President; and if the State also inflicts a penalty, and provides for the recovery of it in her own Courts, this may have a tendency to produce the same effect at which Congress are aiming. To inflict two penalties for the same offence is certainly a very delicate business, and, if the penalty extended to life or limb, would be contrary to the 7th article of the amendments of the constitution of the *United States*, as well as to the 10th section of the 9th article of the constitution of *Pennsylvania.* But it is a question of *power* that we are considering, and not of *expediency.* The *power* is all that this Court can judge of: of the *expediency* (supposing the power to exist) we have no right to judge. The legislative body exercises its powers at its own discretion, and is responsible only to the people, to whom it owes its existence. Whether Congress might, by express provision, have excluded the State from passing any law on the subject *of calling forth the militia*, it is unnecessary to consider, because they have not done so. It is not to be inferred that all State authority ceases on a subject over which Congress *might* assume *exclusive power*, when they have exercised the power only *partially.* The judicial power of the *United States* may be extended to all controversies between *citizens of different States;* but it has not been so far extended : and the consequence is, that the *State* courts have *concurrent jurisdiction* in such cases. And, to come nearer to the point, although Congress have authority to *arm and discipline the militia*, yet they have not exercised it to its full extent. Most of the States have passed laws on the subject; and not only have those laws not been complained of, but the *United States* have derived great benefit from them. Counterfeiting the notes of the late Bank of the *United States* was punishable by the laws both of the State of *Pennsylvania* and of the *United States*. The State law bears date 22d *April*, 1794, and inflicts a punishment of

not less than four, nor more than fifteen years imprisonment, at hard labour. The act of Congress, passed the 29th June, 1798, subjects the offender to fine and imprisonment, and contains the remarkable provision, " that nothing herein con- " tained shall be construed to deprive the Courts of the indi- " vidual States of a jurisdiction under the laws of the several " States over the offences declared punishable by this act." We have here the explicit opinion of Congress, that the States, had power to legislate ; for if they had it not, Congress could not give it to them. This act of assembly is supposed to have been recognised by all the Courts in the State, and by this Court particularly in the case of White v. The Commonwealth, 4 Binn. 418.

Let us now examine the acts of Congress and the act of assembly on the point in question, in order to see whether there be any collision between them. By the act of Congress of the 28th February, 1795, the President of the United States is authorised to call out such number of the militia as he may judge necessary to repel an invasion by any foreign nation or Indian tribe ; and every officer, non-commissioned officer, or private of the militia, who shall fail to obey the order of the President, shall forfeit a sum not exceeding one year's pay, and not less than one month's pay, to be determined and adjudged by sentence of a court martial ; and be liable to be imprisoned by a like sentence, on failure of payment of the fines adjudged, for one calendar month for every five dollars of such fines. By sect. 7, the fines are to be certified by the presiding officer of the court martial to the marshal of the district in which the delinquent resides, or to one of his deputies, and also the supervisor of the revenue, (altered to the comptroller of the treasury, by act 2d February, 1813,) and the marshal or his deputy shall forthwith proceed to levy the said fine, with costs, by distress and sale of the goods and chattels of the delinquent. It may be remarked here, that Congress do not seem to have intended to force any man into the actual service of the United States. A pecuniary penalty and no other is inflicted, in case of disobedience of the President's orders. It cannot be supposed, that a militia man in such situation, (called out, and having made up his mind not to go but to pay his fine,) should be liable to all the articles of war. Nor, on the other hand, in case of

his death, would his widow be entitled to the pension al-lotted to the widows of those who died in actual service. Nevertheless, Congress had the power of subjecting him to a fine, and of trying him for the purpose of assessing and recovering that fine by a court martial. It is not a case in which the delinquent has a right to trial by jury. It has never been supposed so in this State, nor I believe in any other. Fines for breach of militia duty are always recover-able in a summary way. The act of Congress of 28th *February*, 1795, as I have stated, mentions in general terms, that the fine shall be determined and adjudged *by a court martial;* but does not direct how or by whom the court martial should be ordered or held. Hence arose difficulties. There were inconveniences attending courts martial held under the au-thority of the *United States;* but yet it did not appear to be intended by the act of Congress to vest the authority in state officers. Under these circumstances, the legislature of *Pennsylvania*, anxious to forward the views of the President in calling out the militia, and instead of *clashing* with the act of Congress to co-operate with all their might, passed the act of 28th *March*, 1814, in which it was their object to compel the payment of fines by delinquents, and at the same time to guard them against the payment of two fines for the same offence. In the 21st section of this act it is enacted " that every non-commissioned officer and private of the mi-" litia, who shall have neglected or refused to serve when " called into actual service, in pursuance of an order or " requisition of the President of the *United States*, shall " be liable to the penalties defined in the act of Congress of " the *United States*, passed the 28th day of *February*, 1795, " that is to say, &c." It then defines the penalties in the very words of the act of Congress, after which it goes on to enact, that within one month after the expiration of the time for which any detachment of the militia shall have been called into the service of the *United States*, by or in pur-suance of orders from the President of the *United States*, the proper brigade inspector shall summon a general or a re-gimental court martial, as the case may be, for the trial of such person or persons belonging to the detachment called out, who shall have refused or neglected to march therewith or to furnish a sufficient substitute ; and as soon as the court martial shall have decided in each of the cases which have been sub-

mitted to their consideration, the president thereof shall furnish to the marshal of the *United States* or his deputy, and also to the comptroller of the treasury of the *United States*, a list of the delinquents fined, in order that the further proceedings directed to be had thereon by the laws of the *United States* may be completed. No argument is necessary to shew that the intention of this act was to aid the general government in the promotion of the war; nor do I perceive that it is in any respect in collision with the act of Congress. The President might, if he pleased, proceed under courts martial called by his own authority; but it is not to be imagined, that in such case the fine inflicted by the State Court would be levied, or he might receive the fine under the State law, in which case it would be unnecessary to call a court martial under his own authority. The experience of each day impresses us more deeply with the conviction, that in construing the constitution of the *United States*, courts of justice should breathe a spirit of harmony and conciliation. The powers of the states and of the *United States* often approach each other so nearly, that the line of division is almost invisible. While the laws of both then may be executed without clashing, they both should be supported unless they are manifestly in violation of the constitution. And where a construction has long been carried into practice, though unsanctioned by judicial authority, it is worthy of great consideration, because it cannot be overturned without great inconvenience. Let me add too, that where the commencement of this practice was almost coeval with the constitution, there is great reason to suppose that it was in conformity to the sentiments of those by whom the true intent of the constitution was best known. The point now to be decided is of great importance; and has received as it merited my most deliberate and anxious consideration. The result has been a conviction, that in making the act of 28th *March*, 1814, the legislature of *Pennsylvania* did not exceed its authority.

But it is objected, that supposing the law to be valid, the deputy marshal will not be justified, because the laws of the *United States* do not direct any proceedings to be had in a case like this, and the act of assembly refers to the laws of the *United States* for the proceedings subsequent to the sentence of the court martial. It is objected also, that the

1817.

MOORE
v.
HOUSTON.

marshal being an officer of the *United States*, could not be compelled to execute a judgment rendered under the authority of the State. Whether the marshal could be compelled is not the question, but whether, having levied on the plaintiff's goods, he stands justified by the law of the State. The law is not so clear as could be wished. Yet I think it must have been intended, that the proceedings directed by the law of the *United States* should be pursued ; that is to say, that the marshal or his deputy should levy, &c. as directed by the act of 28th *February*, 1795, just as if those directions had been inserted in the act of assembly. The President of the *United States* might, I presume, have ordered the marshal not to levy. The act of assembly left that to the President's direction, because the money was to be for the use of the *United States*. That being the construction of the act, it is of no importance whether a delinquent might be tried by the laws of the *United States*, after the time of his service expired or not. It was the clear intent of the act of assembly, that he should be tried after the time of his service had expired, because it is expressly said so. The brigade inspector is to summon a court martial *within a month after the expiration of the time of service.* Our opinion has been asked whether a *lunar* or *calendar* month is intended. It is a *calendar* month ; because it has been decided by this Court, that by the word *month* in acts of assembly, a *calendar* month is intended. For this I refer to the cases of *Brudenell et al.* v. *Vaux*, 2 *Dall.* 302, and *The Commonwealth* v. *Chambre*, 4 *Dall.* 143.

It was remarked by the counsel for the plaintiff, that the act of Congress of 18th *April*, 1814, containing several provisions with respect to courts martial, being limited in its continuance to the duration of the then existing war, expired on the ratification of the treaty of *Ghent*. When it expired is of no importance, because the court martial in this case was not held, nor was the money levied under the laws of the *United States*.

. It has been contended also on the part of the plaintiff, that the State militia law of the 9th *April*, 1807, and its supplements, were repealed by the act of 28th *March*, 1814, and the provisions of this last law not having been brought into operation at the time when the plaintiff was called forth, the proceedings under which he was drafted, were void. In

answer to this it was argued, and justly, by the counsel for the defendant, that although the last section of the act of 28th *March*, 1814, does contain a repeal of the act of 1807, and its supplements, yet the repeal was not immediate as to those things which were necessary to be done before the provisions of the act of 28th *March*, 1814, could be brought into operation. This appears to be the true construction. The enrolment under the act of 1814, was not to take place till within twenty days after the 1st *April*, 1815. It must have been intended, that the old enrolment should stand till the new one took place. The act was made *flagrante bello;* and it must be a bad construction which would leave the Commonwealth without an effective militia at such a time. In several parts of the act of 1814, there are provisions that certain things should be done under the former laws notwithstanding their repeal, until the provisions of that act should come into operation. And upon the whole, it seems intended, that the duties required by the old laws should continue to be performed, until the regulations of the new law took effect.

Having established these general principles, it will be necessary to advert to the several matters which were offered in evidence by the defendants and rejected by the Court. I shall do it very briefly, because in what has been already said, my opinion on several of these points has been anticipated.

1. The requisition from *William Eustis*, secretary of war, to the Governor of *Pennsylvania*, to have 14000 men in readiness, &c. The original was produced, and it was clearly evidence, being the foundation of the Governor's proceedings.

2. The general order of the Governor, dated the 11th *May*, 1812, founded on the last mentioned requisition, to *William Reed*, adjutant general, and the order of the same date, from *William Reed*, adjutant general, to *Nathaniel W. Sample*, jun., inspector of the 2d brigade, 4th division, *Pennsylvania* militia, to have the quota of militia in his brigade drafted and organised, &c. The objection is, that the commission of *William Reed*, the adjutant general, was not produced. But it was proved that he was dead, and that it had never been the custom to record commissions *at length*, but only to make an entry of the appointment in the register

1817.

MOORE
*v.*
HOUSTON.

kept by the Secretary of the Commonwealth; this register was good evidence. We must pay regard to a custom which has so long prevailed. The recording of all commissions *at length*, would be a work of infinite labour and very great expense; nor would it be of much use. The short entry shews the person appointed, the time of appointment, and every thing else, the memory of which it is important to preserve.

3. The class list and inspection roll of all persons subject to military duty within the bounds of *Jacob Hoon*'s company, 24th regiment, *John Dicks*, lieutenant colonel commandant, 2d brigade, 4th division, *Lancaster* county militia, signed by *Jacob Hoon*, captain, and affirmed to before *Israel Loyd*, esq., 13th *May*, 1812. Also a similar class list, &c. affirmed to before *Nathaniel W. Sample*, jun., brigade inspector, the 12th *May*, 1813. *Hoon* had left the place of his residence, and after diligent search could not be found. I do not perceive why the return, which had been made by him on solemn affirmation, should not be evidence. It is objected, that the affirmation was *ex parte*. True; it was; and so are the returns of officers in most cases. It was at least *prima facie* evidence, though the plaintiff might have been at liberty to falsify it.

4. A muster roll of the volunteers and drafted men, within the bounds of the 2d brigade, 4th division, *Pennsylvania* militia, (officers included) signed *Nathaniel W. Sample*, jun., brigade inspector, dated 6th *July*, 1812, with the indorsement thereon, of the then adjutant general, *William Reed*, as received by him, on the 17th *July*, 1812. The observations made on the third piece of testimony apply to this. It was good evidence.

5. Proof, that *William Reed* was appointed adjutant general of *Pennsylvania*, on the third day of *August*, 1811, and was duly commissioned, and gave bond according to law, and continued to be adjutant general until his death, in the month of *March*, or *April*, 1816. I see no manner of objection to this evidence.

6. The circular letter of the Secretary of the Commonwealth, dated *December* 22d, 1814, to *Nathaniel W. Sample*, jun., brigade inspector, (whose commission had been already in evidence) calling, by direction of the Governor, his attention to the 21st section of the militia law, of the 28th *March*,

1814, the third paragraph whereof made it his duty to summon courts martial, for the trial of delinquents and deserters ordered into service by any general orders, predicated on a requisition by the President of the *United States.* This was clearly evidence.

7. That the present defendants, except *Daniel Moore*, who is the deputy of the marshal of the *United States*, for the district of *Pennsylvania*, *Molton C. Rogers*, who was the judge advocate, and *Nathaniel W. Sample*, jun., who was the brigade inspector, were summoned by *Nathaniel W. Sample*, jun., brigade inspector, as members of a court martial; that they were all militia officers, holding commissions from the Governor of the Commonwealth. This also was clearly evidence.

8. That the said court martial, agreeably to notice, met on *Monday*, the 13th *February*, 1815, organised, and appointed their president and judge advocate, and adjourned from day to day, until 25th *February*, 1815; on which day the plaintiff, *Robert W. Houston*, appeared before the court, and a charge was exhibited against him for disobedience of orders, &c. (*prout*, the charges and specifications). That the said plaintiff put in the plea of not guilty, and under this, gave as a reason why he was not guilty, that he had elsewhere performed a tour of militia duty; admitted that he was an enrolled militia man; that he was duly classed in that class of militia ordered to march by the general orders of the 26th *August*, 1814; that he had notice to march; that he did not march; and, requiring no proof to be exhibited to the court martial of his enrolment, of his classification, of notice to attend at the place of rendezvous, or to march, of his neglect to march, of his notice to appear before the court martial, that the said court martial passed sentence on the plaintiff, the said *Robert W. Houston*, that the said sentence, so passed, was transmitted to the Governor, and by him approved of. This without doubt was evidence.

9. That the sentence of the court martial approved of, and the list of delinquents, were transmitted to the comptroller of the treasury of the *United States*, and a copy thereof to the deputy marshal. There is no doubt but this was evidence.

10. That *Molton C. Rogers*, one of the defendants, was duly appointed judge advocate of the said court martial, and

acted as such at the time the sentence was passed against the plaintiff, the said *Robert W. Houston,* and

11. That *Daniel Moore* was the deputy of the marshal of the *United States,* this also was evidence. It will be perceived at once that most of this evidence was rejected, not from any particular defect in the kind of proof, but from the general principle adopted by the Court of Common Pleas, that the proceedings of the court martial were totally unfounded and void. That principle being overturned, the evidence is admissible of course.

The opinion of the Court has been asked on the 25th section of the act of assembly of 28th *March,* 1814, which provides, that "no *certiorari* or other writ shall in any case "issue from any court of law in this Commonwealth, to re- "move any proceedings that shall be had in any court of ap- "peal or court martial, held under and by virtue of this act, "or under or by virtue of any law of the *United States;* and "no court of law of this Commonwealth, or alderman or jus- "tice within the same, shall, in any case, hear or determine, "or in any manner take cognisance of appeals, that may be "offered or attempted from any sentence or decree passed, "or made by any such court of appeal or court martial, any "law, usage, or practice, or any construction of any clause of "this act, to the contrary in any wise notwithstanding. And "if any justice of the peace, alderman, or judge of any of the "courts of this Commonwealth, shall issue, or cause to be "issued, any writ or process with a view to re-hear, examine, "or obstruct, directly or indirectly, the decision of any court "of appeal, or court martial, or shall, under any pretence "whatsoever, invalidate or defeat, or shall assist to defeat any "sentence of a court of appeal or court martial, any, and "every such justice of the peace, alderman, or judge so hav- "ing offended, shall be deemed and held to be guilty of a "misdemeanor in office; *provided,* that nothing herein con- "tained, shall impair or affect the provisions of an act for "the better securing personal liberty, and preventing wrong- "ful imprisonments, passed the eighteenth of *February,* one "thousand seven hundred and eighty-five."

The object of this part of the law appears to have been to prevent the issuing of writs of *certiorari,* or other writs of removal, by which the proceedings of courts martial might be obstructed or impeded; and there are some general ex-

pressions which prohibit the invalidating, or in any manner defeating the sentence of a court martial, or court of appeal. But I cannot think that it was intended to prevent an inquiry into the *jurisdiction* of the court, and thus deliver the citizens bound hand and foot, to be abused at pleasure by any set of persons who might assemble together, and call themselves a court martial. It would require much clearer expressions than any which are to be found in this law, to make me adopt such a construction ; especially as the same section afterwards give treble costs to defendants sued for any thing done in pursuance of that act, when the jury shall find for them, or the plaintiff shall be nonsuited or discontinues his action ; for it seems to be here taken for granted, that the plaintiff may perhaps prevail in his action, which could not be the case if all inquiry were prohibited. All that I think proper to say at present is, that the jurisdiction may be inquired into. Whether the act has any further effect than to prevent removals by *certiorari*, &c. I do not determine.

Upon the whole, my opinion is, that the judgment should be reversed, and a *venire facias de novo* be awarded.

GIBSON J. I shall not inquire whether the court martial, mentioned in the act of Congress of the 28th *February*, 1795, was contemplated to be held under federal or state authority. I lay out of the case, also, all consideration of the extent of the power of Congress over militia not actually in the service of the *United States*. The proceeding, in this case, was by a state tribunal, acting exclusively under state authority, as far as that authority could be imparted. Unless, therefore, the legislature is restrained from granting it, by some provision of the constitution of the *United States*, the court martial was warranted in the power it has exercised, and the marshal justified in executing its sentence. For, either the act of assembly of the 28th of *March*, 1814, is unconstitutional and void, or the defendants are protected by its provisions. It has, indeed, been argued by the counsel of the defendant in error, that granting the constitutionality of the act, yet at the time his client was ordered into the service of the *United States*, the militia act of 1807 being expressly repealed, the enrolment and classification, made under it, being at an end, and there being, of course, no legally enrolled and classed militia in *Pennsylvania*, on which the or-

ders of the President could operate, he was not liable to the performance of military duty, and that, of course, the court martial had not jurisdiction over his person.   I shall not examine the soundness of the arguments employed to establish this position.   Taking it to be as stated—does it affect the jurisdiction of the court martial over the *offence?*   It may prove the members of that court to have been mistaken on the *merits;* but will that render them liable as trespassers? The defence went to the merits, not to the jurisdiction, and the finding against the accused is conclusive.   I, however, dissent from the rule as it is broadly laid down in *Vanderheyden* v. *Young*, 11 *Johns.* 160. that the plea of guilty will, in every case, preclude a defendant from afterwards disputing the jurisdiction.   The case of *Fabrigas* v. *Moyston, Cowp.* 172. cited as an authority, does not bear the decision out.   If a party indicted in the Common Pleas, were to plead guilty, surely it would not be pretended that the officer, executing the sentence, could justify under it.   Would not the same objection apply, with at least equal force, to a court of special and limited jurisdiction, transcending its powers? *Consensus tollit errorem;* but it will not give jurisdiction.   Consent to a trial of title to land in a county other than that in which the land lies, will not help its being an error, though such consent be of record, 2 *Show.* 98. *pl.* 97. I take the distinction to be between jurisdiction over the offence in the abstract, and jurisdiction over the person. If a party have a privilege, peculiar to his person, of being tried by a particular tribunal, or if there be peculiar circumstances, or exemptions, which prevent guilt from attaching to him, he may wave both.   But a want of general jurisdiction, over the *offence*, cannot be cured by his assent. Now the act of assembly defines the offence, over which it gave this court martial jurisdiction; whether the plaintiff were guilty of that offence, is a question that has been settled by the sentence, and is not now open to controversy.

If the act upon which this proceeding is founded, is in collision with any act of Congress, it is void.   The 6th article and 2d section of the constitution of the *United States,* declares that constitution, and the laws made pursuant to it, to be the supreme law of the land, binding upon the Judges of the State Courts, notwithstanding any thing to the contrary in the Constitution or laws of any State.   It follows, that

where an act of Congress, and an act of a state legislature, come in contact, the latter must give way. A refusal by the state authorities, to execute an act of Congress, in preference to their own law, would be a step towards a dissolution of the Union.

It is argued, that Congress, under the powers vested in it by the constitution, have provided for calling the militia into the service of the *United States*, that it has annexed a penalty to disobedience to the call, and appointed a tribunal to inflict it. Hence, it is inferred the jurisdiction of the *United States* on the subject, must of necessity be exclusive, and that a different penalty, inflicted by a different tribunal, emanating from different authority, would violate the constitution, and put the party twice in jeopardy for the same offence. In fine, that Congress have exclusive possession of the matter, as a subject of legislation.

I cannot suppose, that when the legislature passed the act of the 28th of *March*, 1814, annexing the same penalty to an offence that had already been provided for, by the act of Congress of the 28th of *February*, 1795, it was intended that the latter should be cumulative, and inflicted whether the party were tried and punished under the act of Congress or not. Probably nothing further was meant than to enforce the act of Congress, through the intervention of a state tribunal. But even if it were intended to be cumulative, I know not by what constitutional provision the legislature is restrained from making that an offence against the state, which is also an offence against the *United States*. It is not putting a party twice in jeopardy for the same offence. The same act may constitute two distinct offences, and receive distinct punishments; as, for instance, a breach of the peace committed in the face of a Court. I cannot doubt but the legislature might have gone further than it did in this instance, and have directed the fines levied to be paid into the treasury of the state, instead of that of the *United States*.

It cannot be questioned, but that the federal and state governments have concurrent authority over the militia, when not in the actual service of the *United States*. Congress has power to organise and arm; a state may do the same. The government of the union may draw out the militia in any of

the exigencies, mentioned in the constitution. A state may employ its own militia, for its own purposes. Every state regulation, on the subject, not directly conflicting with a law of the *United States*, must, of necessity, be valid. I grant that a state law, asserting jurisdiction over the person of a militia man, while in the service of the *United States*, would be unconstitutional; for the exercise of such a power over the person, would have a direct tendency to defeat the performance of his military duties to the federal government, whose soldier he is. It is of the very essence of military subordination, to be subject to the controul of but one authority in military matters. But a law operating not on the person, but upon property, would not be liable to the same objection. The plaintiff below, never was in actual service under the President's requisition. What may be the extent of the power of Congress, in regard to bringing forth the whole physical force of the country, when an application of that force shall be necessary, I do not pretend to determine. The existing laws give the alternative of paying a fine or entering the service, at the election of the party. In the present case, he chose the former. Neither the federal nor state governments, have considered a person, refusing to put himself under the military authority of the *United States*, entitled to the emoluments, or subject to the restraints incident to a soldier. The counsel for the plaintiff in error, have put this matter in a strong light, by adducing consequences that would inevitably result from the articles of war, if the plaintiff below should be deemed to have been in service, some of them highly absurd, as applicable to him; such for instance, as being punishable for speaking disrespectfully of the President, forbearing to attend divine service, &c. In addition, he might be treated as a deserter, and his wife would have been entitled to a pension, in case he had died during the term for which he was called out. But even granting him to have been in the service of the *United States;* the provisions of the act of assembly were not to operate upon him, till after the expiration of the term, for which he was called out. He was, therefore, perfectly subject to state authority, at the time. The only question is, whether the state has exercised her authority in harmony with, and subordination to the superior power of Congress? In the valuable case of

*Livingston* v. *Vaningen*, 9 *Johns.* 567, Justice Thompson says, "but because the states have delegated to Congress "this power," (a power to promote the progress of science and the useful arts,) "in a limited degree, shall it be denied "them, to lend their aid in protecting and patronising im- "provements, in any way they may think proper, *not repug-* "*nant* to the right secured under the authority of Congress? "Such a doctrine appears to me degrading to state sove- "reignty, and unnecessarily relinquishing a power not con- "templated by the constitution." And again, "if the sub- "ject matter be *within the scope* of state jurisdiction, and the "power is exercised in *harmony with*, and in *subordination* "to, the superior power of Congress, it is beyond doubt legi- "timately exercised." In the present case, the power exer- cised, was completely and strictly within the scope of state jurisdiction. *Pennsylvania* has never parted with the con- troul over her militia, when not actually in the service of the *United States*. It was exercised in the most perfect harmo- ny with that of the *United States*. The provisions of the act of assembly explicitly, and almost professedly, come in aid of the act of Congress of 1795. No court martial, for the trial of militia, was ever convened by the President, under the act of 1795; and indeed it is doubtful, whether such a court could be convened without further legislative provision. The act is silent, as to all necessary details re- specting the number of officers to compose, and the mode of summoning and organising it. The act of the 10th *April*, 1806, establishing the rules and articles of war, for the go- vernment of the troops of the *United States*, has not supplied the defects. Its provisions, as well as those of the 18th *April*, 1814, (except an unimportant provision in the 3d sec- tion,) are applicable, exclusively to militia, actually in the service of the *United States*. Without the co-operation of state authority, I know not how it is practicable, under the existing laws of the *United States*, for the President to bring the militia into the field. Coercive measures, certainly can- not be resorted to, under the rules and articles of war. Whe- ther the court martial, authorised by the act of Congress of 1795, was intended to be instituted by state or federal autho- rity, I shall not pretend, absolutely, to determine. It is cer- tain, however, that the execution of federal powers has been

1817.

Moore
*v.*
Houston.

expressly delegated, in some instances, to the state authori= ties. Under the revenue and post office laws, jurisdiction is given to the state courts, to carry certain parts of those laws into execution. I will not say at present, whether, according to the constitution, Congress can compel the state courts to exercise this borrowed jurisdiction. But until the state governments shall prohibit their courts from taking cognisance of questions, arising under these laws, I can see no objection to their doing so. But the case becomes infinitely stronger, when an act of the state legislature sanctions and enjoins the execution of such federal provision. This is in strict accordance with the opinion expressed by general *Hamilton*, the most able constitutional lawyer this country has produced. " Agreeably to the remark, already made, the " national and state systems are to be regarded as one whole. " *The Courts of the latter, will, of course, be natural auxilia-* " *ries, to the execution of the laws of the union.*" *Federalist*, No. 82. If then the state judiciaries may be auxiliary to the federal government, what is to prevent the state legislatures from lending their aid to the federal executive, to give greater facility to the execution of his measures? What was the object of the framers of the act of assembly of 1814? certainly to give greater effect to the requisitions of the President: to add a state penalty to the violation of a federal duty. Was the state legislature prohibited from acting on the subject, by any express restriction of the constitution, or by any necessary, direct, and irresistible implication? surely not. " That the mere grant of a power to Congress," (says Justice THOMPSON, in the case of *Livingston* v. *Vaningen*, before cited,) " does not necessarily imply an exclusion of " state jurisdiction, has been the practical construction of the " constitution, in a variety of cases. As, for instance, Con- " gress have power to provide for the counterfeiting the cur- " rent coin of the *United States;* yet the legislature of this " state has provided for the punishment of the same offence ; " and numerous other instances might be mentioned, if neces- " sary." In like manner, the state of *Pennsylvania* passed a law on the 22d *April*, 1794, rendering it penal to be concerned in printing, signing, or passing, any counterfeit note, of the late bank of the *United States*. Congress had before provided a punishment for the same offence, by the act which

incorporated that institution. Yet the state law was execut-
ed in *White's case*, 4 *Binn.* 418, without a doubt being sug-
gested of its constitutionality. So, by an act of assembly,
passed the 11th *February*, 1777, treason against the state of
*Pennsylvania*, is defined to be " aiding or assisting any ene-
" mies, at open war against this state, or the *United States*,
" by joining their armies, by enlisting or procuring, or per-
" suading others to enlist, for that purpose, or by furnishing
" such enemies with arms or ammunition, provisions or other
" articles, for their aid and comfort," &c. Most, if not all
the acts therein enumerated, would also be overt acts of trea-
son, against the *United States*. It is true, this act was pass-
ed before the existence of the federal constitution. But can
it be doubted, but that the state would be at liberty to prose-
cute, under it, in case the *United States* should decline to
proceed, or should pardon after conviction? I think not. But
the uniform practical construction, given to the constitution
by the federal and state governments, on the subject of the
militia, has carried the doctrine of concurrent jurisdiction,
full as far as the act of the 28th *March*, 1814, has done. The
documents, read by the counsel, for the plaintiff in error,
abundantly prove it. The militia law of *Kentucky*, passed
on the 4th *February*, 1815, contains provisions substantially
the same. But independent of the effect of this mass of
practical construction, I could not bring my mind to doubt
the constitutionality of the act in question. It contravenes
no provision of the constitution, nor of any act of Congress ;
it is made in harmony with, and in aid of, the federal provi-
sions on the same subject.

The machinery of our government, viewing the federal
and state portions of the sovereignty, as constituting one
whole, is extremely complicated. It was not to be expected,
in forming the constitution of the union, that every possible
collision could be foreseen and guarded against. It came
from the hands of its framers, an untried system. It was
uncertain how far the several parts, when put in motion,
would perform their offices in harmony. In practice, it has
exceeded the expectation of its friends, and in the language
of one of the counsel, has done wonders. Hence a construc-
tion, tested by practice, and like the rules of the common
law, the gradual result of experience, is of incalculable value,

1817.

MOORE
*v.*
HOUSTON.

in supplying those details, that were in their nature too minute to excite the attention of the convention. The construction of the law becomes part of the law. The necessity of liberality, in expounding the constitution, adapted to the nature of those exigencies, that unavoidably *grow* out of the complexity of structure, in our political institutions, was clearl; and ably demonstrated by the Chief Justice, in the case of the *Farmers'* and *Mechanics' Bank* v. *Smith*, lately decided in this Court. If a contrary rule were adopted, a total prostration of state sovereignty would be the consequence. " Such a doctrine," says Chief Justice KENT, in *Livingston* v. *Vaningen*, " would be constantly taxing our " sagacity, to see whether the law might not contravene some " future regulation of commerce, or some monied or some " military operation of the *United States*. Our most simple " municipal provisions, would be enacted with diffidence, for " fear we might involve ourselves, our citizens, and our " consciences, in some case of usurpation." Fortunately a different doctrine prevails. Every legislative act, which does not palpably and directly, or by some irresistible implication, invade a constitutional principle, is held valid. The power to declare an act of the legislature unconstitutional, is in its nature, a delicate one, and its exercise can be justified in extreme cases only.

During the argument, I entertained a doubt whether the marshal could justify his proceedings, under the 21st section of the act, an authority not being given to him in express terms, to collect the fines imposed, according to the mode pointed out in the act of Congress of 1795, and its supplements. On reflection, I am satisfied those acts are to be considered, as adopted by the state legislature, and are to have the same force, as if re-enacted in terms. It never could have been the intention of the legislature, that a penalty should be imposed without authorising its collection. The execution of the sentence, according to the mode pointed out by Congress in similar cases, if not enjoined, is at least permitted, and those acts are recognised as furnishing a rule of proceeding. Even should they be deemed to have no force, as laws of the *United States*, I should consider them as having effect for this purpose, as laws of *Pennsylvania*.

I pass over the mode, selected by the plaintiff below, to

bring the question before the Court, with a single remark. It is to be regretted he did not demur to the defendant's special pleas, instead of taking issue on the facts. It would then have come directly before the Court, as an issue of law, and the cause would not have been embarrassed with the prejudices, that might exist in the minds of a jury. The evidence, to which he excepted, went directly to prove those facts. On an exception to evidence, the question is not, whether the facts attempted to be proved, will make out a good case, but whether they are pertinent to the issue, and legal in other respects. But whether the proceedings of the court martial could be set up as a justification or not, the Court clearly erred in excluding the evidence.

It would be unnecessary to consider the operation of the 25th section of the act, if it had not been made a question below. From the whole of this section, it seems to have been the intention of the legislature, to render the proceedings of courts martial, instituted by competent authority, and acting within the limit of their jurisdiction, final and conclusive, without appeal, and when brought in question incidentally, to prevent a re-examination of the merits, or an objection on the ground of informality. I cannot believe it was meant to extend the protection of this act to any combination of persons, calling themselves a court martial, but acting without warrant or authority; nor even to the acts of a court martial, legally constituted, that should transcend its powers. If, therefore, it should appear that such court was legally constituted, that it had jurisdiction of the offence of which it took cognisance, and that it inflicted a punishment, known to the law, its sentence would be conclusive, and exempt from further inquiry. It appears to me, the sentence of the court martial, on which the defendants rested their cause, was free from exception, on any of these grounds, and therefore, that they were protected by it, and might safely have relied on this section alone, had it been necessary to avail themselves of it.

Several exceptions, of minor importance, with respect to the admissibility of particular parts of the evidence offered, have been argued by the counsel, for the defendant in error. I am satisfied, the ground taken in support of them is untenable. I shall not examine them in detail, as I concur fully,

1817.

MOORE
v.
HOUSTON.

with the opinion of the Chief Justice, on this part of the case, for the reasons he has assigned. I am, therefore, of opinion, that the judgment of the Court of Common Pleas be reversed, and that a *venire facias de novo* be awarded.

DUNCAN J. gave no opinion; having been of counsel for the plaintiff.

> Judgment reversed, and a *venire facias de novo* awarded.

*N. B.* A writ of error was taken from this opinion of the Supreme Court, to the Supreme Court of the *United States*, and argued in *March*, 1818, and the writ of error was dismissed.

The case was again tried, *March* 23, 1818, in the Court of Common Pleas of *Lancaster* county, and a verdict given for the defendant.

A writ of error was thereupon taken to the Supreme Court of *Pennsylvania*, which was argued in *May*, 1818, and the judgment of the Court of Common Pleas affirmed.

A writ of error was thereupon taken to the Supreme Court of the *United States*, which was argued *March*, 1819; and in *February*, 1820, the judgment of the Supreme Court of *Pennsylvania* was affirmed.