[PHILADELPHIA, JANUARY 23, 1832.]

## HOWELL and Others *against* M'COY.

### APPEAL.

The plaintiff has a right to support his cause of action by proof of the facts stated in the declaration, whether they are sufficient in law to entitle him to recover or not; and this can only be prevented by a demurrer which admits the truth of the facts as set forth. If there be a defence, the defendant must avail himself of it, when the whole case is before the court and jury, by a direction on the law arising from the facts.

This court, however, will not, on a motion for a new trial, reverse the judgment of the Circuit Court, for the rejection of testimony, which, if admitted, would not give the plaintiff a cause of action.

The erection of any thing in the upper part of a stream of water, which poisons, corrupts, or renders it offensive and unwholesome, is actionable.

The erection of a tan-yard comes within the operation of this principle, provided it has the effect of corrupting and rendering unwholesome the water in the stream below, so as to be injurious to the other proprietors.

The limitation of these principles, is, either where there has been an appropriation for a period of twenty years, which, in law, raises a presumption of right, or it arises from contract.

One, who by a lease has a right to so much of the water of a stream, as shall be needful and proper for the supply of a tan-yard, and the working of a bark-mill, and is bound to return all the water which he diverts for such purposes, over and above the quantity which should be necessarily used and consumed in conducting the business, without unnecessary and unavoidable loss, diminution or waste, into the creek above a dam situated lower down the stream, has no right to return it polluted by admixture with substances of a poisonous or unwholesome nature, to the injury of the lessor, or those claiming under him.

Although what is *necessary* to the enjoyment of the thing demised, passes with it as an appurtenant, without express words, yet what is merely *convenient* does not

Therefore, a lease of a piece of ground for a tan-yard and bark-mill, with the use of so much of the water of a stream as may be necessary for conducting the business, does not carry with it a right to the lessee, to empty the contents of his tan-yard into the stream, or to dispose of his surplus tan on the adjoining land of the lessor.

ON an appeal from the judgment of the Circuit Court of *Northampton* county, held by HUSTON, J. in *April*, 1831, it appeared, that this was an action on the case for a nuisance, in which the plaintiffs *George G. Howell, Peter S. Mechler*, and *Joseph Howell*, complained, That they were possessed of a certain messuage, tenement, dwelling-house, grain distillery, water grist and merchant mill, and saw mill, and tract of land appurtenant, &c., with the benefit and advantage of a stream called *Martin's* Creek, which runs and flows from a dam therein, along a certain head race, to the dwelling-house, distillery, merchant, grist and saw mill, and for supplying the dwelling-house with water for culinary and domestic purposes, and the distillery and mills with water for use therein and the working thereof: That the defendant intending to injure &c., threw into the dam or pool, &c. divers quantities of tan, bark and ross, and discharged therein the contents of divers lime vats, bates, and greasy, glutinous, gelatinous, and other

offensive, poisonous and unwholesome matter, whereby the head-race was greatly filled, choaked and obstructed, and the quantity of water passing to the mill greatly decreased and lessened, and the quality altogether injured and destroyed, for distillation and for culinary and domestic purposes. They also declare, that by throwing in the same, &c. it was carried into the head race, whereby the race was obstructed and choaked, and the necessary quantity of water could not pass to the mill and distillery of the plaintiffs : That they were thereby put to great trouble and expense in clearing out their head race, and in procuring a sufficient and necessary supply of pure and wholesome water, for distillation and for domestic and culinary purposes.

The defendant pleaded, not guilty, &c.

The premises mentioned in the declaration, formed the greater part of a large tract of land, the whole of which had formerly been the property of *William M'Call,* who on the 8th *December,* 1821, executed a lease to *Anthony M'Coy,* the defendant, for fifty years from the 2d *February,* 1814, for another part of the said large tract, which will be particularly described hereafter. This lease recited an agreement between *William M'Call* and *Anthony M'Coy,* by which it had been agreed, that *M'Call* should demise to *M'Coy* a lot of ground in *Lower Mount Bethel* township, for the term of fifty years from that day, on the conditions hereafter stated: That *M'Coy* was to have the right and privilege of erecting and maintaining on the said lot, during the said term, a tan-yard, and all the necessary buildings for carrying on the same, and the business of grinding bark, as well for sale or exportation, as for the use of the said yard, and of using the water of *Martin's* Creek for the purposes aforesaid (under the restrictions and limitations, and according to the provisions in the lease specially set forth and contained), in pursuance of which agreement, the said *Anthony M'Coy* had entered into possession of the said lot, and had set up a bark-mill thereon, and had sunk vats, and formed and established a tan yard on the same, and had conducted the water from *Martin's* Creek above the said lot, through the said lot, to the bark mill and tan-yard, for the use and purposes thereof: Therefore the said *William M'Call* did demise the said lot (describing it as containing two acres and twenty-six perches, together with the full and free use, right, liberty and privilege, to form, construct, establish and maintain a tan-yard thereon, and sink vats, and make, set up, and erect on the same lot, a bark-house, currying-shop, and all other necessary, convenient and proper buildings, for carrying on and conducting the same trade and business of a tanner and currier, and of erecting and maintaining on the same lot, a bark-mill, with all proper and convenient machinery for grinding with one stone, bark, as well for the use of the said yard as for sale or exportation, and of taking and conducting from and out of *Martin's* Creek, on the land of the said *William M'Call,* adjacent to and above the demised lot, so much of the water of the creek, as shall be needful and proper for the supply of the tan-yard, and for working a pump therein, and for grinding

(Howell and others *v.* M'Coy.)

bark at the said mill, with one stone and no more, and for no other use and purpose whatsoever ; and to that end, to erect and maintain a dam in and across the creek of the height necessary for the purposes aforesaid, and no higher, at the place where the said *Anthony M'Coy* has already constructed a dam, above the demised lot, and to lead and conduct the water of the creek out of the same, at and above the said dam, through the adjacent land of the said *William M'Call,* to, upon and through the demised lot, to the mill and yard aforesaid, through, in, and along the race or water course already made and constructed for that purpose by the said *Anthony M'Coy,* by virtue of the before-recited agreement, in quantity sufficient for the uses and purposes aforesaid, and in no larger or greater quantity, and in no other or different course or direction, and for no other use or purpose whatsoever, *provided* always that the water of the said creek be not raised by the dam so high as to swell or flow back beyond the line of the said *William M'Call,* upon the land above the same and adjacent thereto : *and provided* also, that the water which shall be conducted to the mill and yard over and above the quantity which shall be necessarily used and consumed in conducting the business and which shall flow and pass from the mill, shall from thence be conducted, without unnecessary or unavoidable loss, diminution or waste, and returned into the said creek by a sufficient tail-race, at and above the present mill dam of the said *William M'Call;* to which end the said *Anthony M'Coy,* his executors, administrators and assigns, shall raise and maintain a dam or mound along the lower side of the said tail-race, to prevent the waste and escape of the said surplus water, before it shall reach the creek at the mill dam of the said *William M'Call,* together with free liberty of ingress, egress and regress into upon and over the adjacent lands of the said *William M'Call* above and below the demised lot, for the purpose of repairing and maintaining the dam or mound and the races or water courses, at all necessary and convenient times, with workmen, carriages, horses, &c. as far as shall be necessary for mending, upholding, repairing and maintaining, the said dams or mounds, and for cleansing, scouring, repairing and maintaining the said races or water courses, and no further, and at no other times, and for no other purpose or purposes.

A long time prior to the execution of this lease, and the agreement recited in it, there had been erected on the large tract belonging to *M'Call,* below the tan-yard, a merchant and grist mill, a saw-mill and distillery, for all which he used the water of *Martin's* Creek, and the water of the creek taken from the head race of the merchant and grist mill was also used for domestic purposes in the dwelling house of *M'Call,* and by his workmen and their families, who lived contiguous to the head race.

On the 2d *June,* 1825, *William M'Call* conveyed this tract of land, with the mills, distillery and appurtenances, to the President, Directors and Company of the Bank of *Pennsylvania,* to whom he, at the same time, assigned the above mentioned lease to *M'Coy.*

(Howell and others *v.* M'Coy.)

The Bank of *Pennsylvania,* on the 22d *September,* 1826, conveyed the said tract of land, mills, &c. and assigned the said lease, to *Eseck Howell.*

On the 10th of *October,* 1827, *Eseck Howell* leased the said tract of land, merchant and grist mill, saw-mill, distillery, mansion-house, out-houses, barn, sheds, stables, dwelling houses for workmen, &c. conveyed to him by the Bank of *Pennsylvania,* together with the privileges and appurtenances thereunto belonging, to *George G. Howell, Peter S. Mechler,* and *Joseph Howell,* the plaintiffs, for four years and three months from the 1st of *January,* then next ensuing. These were the premises mentioned in the declaration.

After the plaintiffs had examined several witnesses to prove the facts set forth in the declaration, his Honour observed, that the lease from *Eseck Howell* to the plaintiffs mentioned a lease from *William M'Call,* the former owner of the whole tract, to *Anthony M'Coy,* the defendant, for the tan-yard property, and asked for its production. It was accordingly produced and read. The counsel for the plaintiffs, having proposed to ask a witness, whether the water was not corrupted and rendered unwholesome by the acts complained of, the counsel of the defendant, objected to the question being answered, but the judge sustained the objection, observing, that " the man, who rents a piece of ground for a tan-yard, cannot claim damages from the person to whom he has rented it for that purpose, for discharging the contents of his yard, &c. He who claims or rents a property, subject to an easement, must take it subject to the easement, as it was used when he took it." At the request of the plaintiffs' counsel, his Honour noted an exception to this opinion. The plaintiffs' counsel then offered to prove the number of families on the plaintiffs' premises, who depended on this water for domestic purposes ; that it was corrupted so that it could not be used, and that it was injured for the purposes of distillation. This evidence being objected to, was also overruled by his honour, who noted the point.

The defendant asserted a right to throw tan or ross, and to empty the contents of his vats into the stream, in the manner stated in the plaintiffs' declaration, by virtue of his lease from *William M'Call,* of *December* 8th, 1821, for fifty years from *February* 2d, 1814, which he alleged was made with express reference to the manner, in which he had been accustomed to use the water, under the parol contract referred to in the lease.

After the lease had been read in evidence, he offered to prove, that he always threw tan into the stream. The evidence was objected to, by the plaintiffs' counsel, but admitted by the court.

*Richard Merrill* was then examined on the part of the defendant, who testified, that he had known this property twenty or twenty-one years ; that he went there twenty-one years ago, and lived there ten years ; that the race ran pretty rapidly along till it came to the tumble of the saw-mill ; that, at the first gate, the gravel would be beaten down by the gully, and make a kind of a stop and an eddy below ;

the leaves, dirt and trash would settle there when there was no tan-yard, and they had to clean the place very often; they had a general frolic cleaning the race, three or four times whilst he was there; that they went at other times and cleaned other little places; that the gully above comes off *Mench*'s land, and comes down some fields; the fields are plowed occasionally; that the saw-mill dam didnot fill up a great deal, though it did partially; that there are two gullies, which come into the saw-mill dam from a flat field above, which was some-times ploughed, and he had seen it half leg deep there with dirty water; that very little tan came down whilst he was there; there was none in the dam to hurt it; he saw very little in the creek, and in the race; it would settle along the creek going down; he had seen *M'Call* frequently along and around there. On his cross-examination, the witness said, that no tan came down in the race to the saw-mill dam; he saw it in the creek as low as the saw-mill, but not in the race; the upper dam was somewhat lower on the side next to the tan-yard, which made some difference; in *Yohe*'s time, that dam was all swept out; they had since repaired it, and the witness did not know the situation of it since.

*Samuel Eaken,* another witness examined for the defendant, stated, that he had known this property before *M'Coy* came to it; that he had seen tan thrown into *M'Coy*'s tail-race; that the first tan he hauled out, he wheeled before the tan-yard, and he continued to do so, till he got to the end of the race, and then he threw it on the edge of the bank, where some laid and some fell in; that he helped to sink the first vats that were sunk there; they were sunk in the handling house, and logs were laid under; that the tan did not come down the creek immediately, but shortly after they saw tan in the creek below the dam; that he could not say, whether Mr. *M'Call* lived there then or not; if he did not live there, it was shortly after be went away. Being cross-examined, he said that he had seen Mr. *M'Coy* employ hands to throw in tan when the water was high, run-ning over the dam; that he had never seen them throw it in, except when the water was running over the dam; they were throwing in what had been previously wheeled to the edge of the race; that he did not recollect seeing any tan going down the head race; that Mr. *M'Call* once cleaned the race; it got very full below the tumble, and he made a frolic, and the witness was one of the hands; that they threw out a considerable quantity of mud and leaves, and he supposed there was gravel, but there was no tan; this was before *M'Coy*'s time.

*Morris Morris,* who was also sworn for the defendant, testified, that he went to this property, to the saw-mill in 1820; he saw tan; some came down the race, and a quantity was in the creek, and continued the whole length of time he staid there; he helped to clean the race in 1822 or 1823; in places there was a great deal of gravel; just below the tumble, it was nearly all gravel; the ice generally formed about the old forebay between that and the tumble; the earth set-

tled most, from the tumble about two hundred yards down; the race appeared lower at that place than lower down; sometimes, after a shower, if the field above was ploughed, the race filled up about the old forebay; where the gully comes down, a great body of water descends from that field after a heavy rain; the witness lived there six years, and left the place when *Yohe* went away; the mill remained idle the summer after *Yohe* left it, and Mr. *Howell* got it that summer; the witness did not know that the dam had filled up much more than it did; it filled up more or less every year, some years more than others; that depended upon whether or not the field was ploughed, in which the saw-mill dam was; he thought Mr. *M'Call* moved to *New Orleans* in the fall of 1820; he sold out to *M'Coy*, and he to *N. Brittain*; the witness continued to work for them until *Yohe* came there; after *M'Coy* began, he saw tan carried out in front of the tan-house; he thought the dam appeared higher than when he lived there; it appeared to be raised clear across, &c. There used to be a low place next the yard, where the water ran over before it did at any other place; there is a three inch plank on the top of the logs clear across, and on that low place, there is a piece of timber fixed six or eight inches thick; the top log was on these pieces; there was one log torn off the dam whilst he was there, and he assisted in putting it back; this happened, he thought, in the third year he lived there; he did not discover, that the dam had sunk.

*George M'Ewing*, another witness for the defendant, swore, that he came to *M'Coy* on the 26th of *February*, 1821, and worked with him till the 6th of *April*, 1830; the greatest business done in the yard was from 1825 to 1828; that when Mr. *Howell* got the property, he scolded about their throwing tan into the race, and *M'Coy* said they had better quit it, as it might lead to a disturbance or quarrel; that they threw it on the bank, and in high water, into the race; that before *Howell* came there, they threw all the tan into the race; they made use of the race for that purpose; that after that time, they only threw it in at high water; at low water, they put it on the bank, according to his orders; that they would get two or three hands in the spring, and throw it into the creek when the water was high; that there might be a place for a time to put the tan upon, but it would not do many years, unless it was piled pretty high; it might be deposited there for one year; that *M'Coy* and *Howell* had some scolding, and *M'Coy* told the witness when he went away, not to throw a shovel-full into the race; that he was away, and they were letting off some limes, and *Howell* found fault with it, when the witness asked him if he would not let him shut down the gates; he asked the witness how long it would keep, and he answered from ten to fifteen minutes; *Howell* then turned round and told his men to take particular notice whether they could perceive the loss of the water, whilst the gates were down; that the witness saw one of the men, and asked him, and he said he could not perceive the loss of the wa-

ter; that they shut the gates down when *Yohe* lived there, when they drew off limes; that when he first knew the dam, it was higher from five, to six or seven feet from the bank; then it sunk down, and the further over it bent, the higher it rose towards the other side of the creek in *Yohe*'s time; that *Howell* put a three-inch piece on the log, and after the firm came, they put on another piece at this low place; that the piece of timber and the round piece, raised it about ten inches; that when they let off water or tan, it would run over there, and would not dam so much; after they were put on, the filth was carried down more than it was before; that the dam, after he came there, was lowest on the side next to the tan-yard; that after *M'Coy* told him, they shut the gates and let off the tan when the water was low, but when the water was high, they threw it in without shutting the gates; that he remembered seeing *George G. Howell* and *Metzger* at the forebay when they had just done casting in the tan letch; that the witness wheeled away the most of it, and was scraping up what remained; that they threw it out with shovels, and wheeled it along the race; it did not all go in; he thought he was not throwing into the race, when they were there, what was wheeled to the bank; that in *Yohe*'s time, they threw it into the race, or on the yard, whichever was the handiest, both at high and low water; that in letting off limes or bates, *Howell* scolded so much, that they shut down the gates, but whether or not they did for the bark, he could not say; that they were in the habit of wheeling the tan along the race, and throwing it in, in the spring of the year, but they did not do this so much till after Mr. *Howell* scolded; when the water is seven inches over the strip that *Howell* put on, it throws the water eight inches on *M'Coy*'s sheeting; he never measured before the piece was put on; it rose in *M'Coy*'s limes and bates, from four to five inches; they would not run off dry, as they had done before.

*Owen Rice* was also examined on behalf of the defendant, and stated, that he was along the race in the fall of 1829, when both parties were present; that they went up the race, and viewed the different places; that there was a good deal of stuff thrown out, lying on the bank, and there was stuff taken out with a stick to shew them; the sediment in the race was tan, gravel and leaves; what was thrown out was sand, tan, gravel and leaves; that they found a good deal about the tumble, and there appeared a considerable quantity of leaves in the race; that from the situation of the race, a good deal of gravel, &c. must be carried in by the rains; that part of the ground is flat, and a very large part hilly; that there were two gullies, at one of which there appeared to be a considerable deposit; that in a race situated as this, large quantities of stuff must be collected; it could not be otherwise; *M'Coy* said the forebay had been lowered; the dam had been raised; the witness thought the dam was highest next to *M'Coy*'s; no water was running over when they were there; the tail-race empties about a perch above the dam.

*Isaac Wikoff*, who was also produced by the defendant, swore that

(Howell and others *v.* M'Coy.)

he was present on the occasion spoken of by the last witness; that their attention was more directed to what was in, than what was thrown out; there was tan, and mud, and leaves thrown out; he could not say in what proportions, but it did not strike him there was a great quantity; in some places there was more than in others, particularly at the tumble; the part of the dam next the tan-yard, appeared to have been lower, and there was a piece put on, whether it was higher or lower, he could not say; *M'Coy* alleged the dam had been raised, and the witness thought that *Howell* said it had not.

*Daniel Keim,* a witness examined on behalf of the defendant, stated, that from next to *Howell's* race, they raised it till a little the other side of the middle of the creek, between three and four inches; from there about twelve feet, they did not raise it more than an inch; from there, for six or eight feet, they raised it between three and four inches; that brought them to the bank on *M'Coy's* side; *Howell* planked on the lower side, where it was washed out; this was done to nail the sheeting to; the dam was low in the middle; there was a deep hole below the dam all the way over; it was washed out most from *Howell's* side, towards the middle; one of the logs in the middle where the low place was, was pretty rotten, and they had to pin it in the knots; he thought *M'Coy* was there once while they were doing this.

*Charles Stroud,* being sworn for the defendant, said, he knew the lines; there appeared very little space to throw the tan in the yard; he supposed they would fill it in six months or a year; there were from sixty to seventy vats in the yard, from four feet six inches, to five feet deep, &c.; *M'Coy* used from four hundred to five hundred cords of bark a year; in warm weather, the letches were emptied every day.

*William Bitters,* another witness for the defendant, swore, that he did not know when the dam was raised; it was higher than it used to be; below the dam, the tan settles in a low time, but the least current sweeps it out; a fresh clears it out; he lived by the sawmill in *M'Call's* time; the dam was full of mud then, and is full of mud yet; he used to cross the dam; then the sticks that went up the dam could be seen; now it is filled up, and they cannot be seen; the piece that has been put to it, can be seen; he did not know whether the old dam had settled or not.

After the defendant had closed his testimony, the plaintiffs examined *Peter Dietz,* who testified, that he was miller there in *M'Call's* time; that he knew of no tan being thrown in, in *M'Call's* time; that none came down the race, and there was no complaint; that from the tumble, for two hundred yards down, the tan was the greatest proportion; that he had known the dam since 1804; that when constructed, it appeared to be a level dam; that he could not say it was or was not higher than when *M'Coy* came there; he did not think it was any higher.

*Christian Metzger,* who was also called by the plaintiffs, swore, that they did not lower the forebay when it was put in new.

His HONOR charged against the plaintiffs' right to recover, and the jury found a verdict for the defendant.

A motion, made on behalf of the plaintiffs for a new trial having been overruled, they entered an appeal to this court, for which the following reasons were filed :

1. That the court erred in rejecting evidence in support of so much of the declaration as charged the defendant with corrupting the water flowing into the plaintiffs' premises, by casting the spent liquors, lime vats, bates, and other injurious and noxious substances therein.

2. That the court erred in charging the jury, that under the lease from *William M'Call,* the defendant had a right to discharge his tan and vats into the tail-race of his bark-mill, and that the lease bound him to return all the ooze, spent liquors, and the contents of his vats into the creek above the plaintiffs' dam.

3. Also in charging : That the plaintiffs', being but lessees under a subsequent lease, had no right of action against the defendant, who was also a lessee, but under an older and longer lease, if the defendant had been accustomed to discharge his tan, and the contents of his vats into the tail-race emptying into the plaintiffs' dam at the time their lease commenced.

4. That the court erred in telling the jury, that from the evidence there was great doubt, whether there was any injury done to the plaintiffs' mill and distillery, by the tan discharged into the dam and race.

5. That under the evidence in the cause, the court should have charged the jury that the plaintiffs were entitled to recover.

*Brooke* and *J. M. Porter* for the appellants.—The plaintiffs have been interrupted in the enjoyment of their mills, annoyed and injured in the use of their distillery, and deprived of many of their most necessary domestic comforts by the acts of the defendant : and having been unable to obtain redress in any other way, they have brought this suit to recover damages for the injuries, of which they complain. The defendant has merely pleaded not guilty. He has not pleaded a license, which, if it existed, it was incumbent on him to plead and prove.

To poison a water course, gives a right of action to the party injured. Such was the law in the time of Lord COKE, and such it has continued to be ever since. *Angel on Water Courses,* 59. 4 *Mason's Rep.* 400. 2 *New Hamp. Rep.* 532. 537. If then the plaintiffs have sustained an injury by the corruption of the waters of the creek, to the use of which they are entitled, they must recover damages from the defendant, unless a license has been proved. The facts established by the evidence of the plaintiffs, showed such acts to have been committed by the defendant, as must have poisoned the water of the creek, and they had a right to ask the witness who was under ex-

amination, whether the water had not been corrupted and rendered unwholesome.    But the judge anticipated the defence, by calling for the lease, upon which he supposed the defendant would rest, giving his own construction to it and rejecting the evidence.    He interrupted the plaintiffs in their regular course, and forestalled the merits of the case, by requiring the production of a paper, which had not, and in that stage of the cause, could not have been offered in evidence, and acting upon it as if it were regularly before the court and jury.    This was clearly wrong.

In his construction of the lease under which the defendant attempted to justify, the judge was also wrong.    His construction of the instrument was, not only that the defendant had a right to discharge the contents of his tan-yard into the tail-race of his bark mill, but that he was bound to return all the ooze, spent liquor, &c. into the creek above the plaintiffs' dam.    For this idea, which supposes the lessor to be destitute of common sense, and totally incapable of understanding his most obvious interests, there is no warrant in the lease.    Its terms require the defendant to return all the water taken out of the stream for the use of his mill and tan-yard, beyond the quantity which shall be necessarily required in conducting his business, with as little diminution as possible, into the creek above the plaintiffs' mills.    Now, it is clear, that after the water had been corrupted and poisoned by admixture with hair, lime and other foreign and contaminating matters, it no longer possessed the character of water, but became a different substance, highly deleterious and wholly unfit for any useful purpose, which the parties never could have intended, should be given to *M'Call* instead of the element by means of which he could make an advantageous use of his property, and which was essential to the comfort of his family, and those of his workmen employed about his establishment.    To suppose, that *M'Call* intended, for the paltry consideration of the rent reserved by the lease, not only to destroy one of the most extensive establishments in the country, but to deprive himself of his supply of water for domestic purposes, is to ascribe to him absolute insanity. The lease evidently had regard as well to the quality as the quantity of water to be returned for the use of *M'Call*.    This is apparent not only from the plain common sense construction of the language used in reference to this subject, but from other parts of the instrument. The defendant was to erect mounds for the purpose of preserving the surplus water, not the contents of the vats; what they contained, was not surplus water.    It is called bates, spent liquor, ooze, &c. and does not in any respect retain the character of water; it is totally changed.    To suppose that the parties intended to secure to *M'Call* this impure liquid, totally unfit for the purposes of his business establishment, and still more so, if possible, for those of his domestic establishment, is absurd.    It is no argument in favour of the defendant's construction to say, that he had hemmed himself in so closely, that he had no room to dispose of the refuse of his establishment, and

(Howell and others *v.* M'Coy.)

therefore was compelled to throw it into the water. This is his own concern. He should have foreseen how much land would be required for his business, and taken care to secure it by the lease. Besides, it was not *necessary*, that he should dispose of the contents of his tan-yard in the manner in which he did, however *convenient* it may have been; and although what is *necessary* to the enjoyment of a grant, passes with it without express words, yet what is merely *convenient*, does not.

The plaintiffs, though they were in under a lease subsequent to that of the defendant, had a right to maintain this action, even if the defendant had been in the habit of doing the acts complained of, when the plaintiffs' lease commenced. The defendant's lease gives him no such right, and if he does not derive it from that source, he can support it on no other ground than an uninterrupted *user* of twenty years. 2 *Big.* 5 *Pl.* 5. 7 *Pick.* 198. *Angell*, 44, 45, 46. 60. 15 *Johns. Rep.* 213. 4 *Mason's Rep.* 397. A usage for a short period prior to the execution of the defendant's lease and afterwards, amounts to nothing. Even an article of agreement is absorbed in a subsequent deed, which is considered as expressing the ultimate intent of the parties. *Crotzer* v. *Russell*, 9 *Serg. & Rawle*, 78. A *multo fortiori* a parol agreement, proved merely by a practice supposed to have existed under it, is lost in a written lease making provision for a different state of things. That the defendant has used the privilege he now contends for, uninterruptedly for twenty years, will hardly be pretended. The evidence entirely negatives such an idea. It shows, that prior to 1821, the right was not even asserted by *M'Coy*, for when the nuisance was discovered, and *M'Call* was informed of it, the defendant promised to help him to remove it. Again, when *Howell* complained of it, he did not assert a right, but ordered his hands not to repeat it. No tan was thrown in until 1822, when *M'Call* was in *New Orleans*, and even then it was not done under an assertion of right. In fact, the evidence shows, that no adverse right was ever asserted, which is necessary to give title by possession. Such was the state of things when the plaintiffs took their lease, and the defendant can have no other rights now than he had then.

There is no ground for a suggestion that the plaintiffs were the authors of the evils of which they complain. They never raised their dam. It had sunk by the operation of time, and they did not raise it even to its former height. They merely put a piece on the lower side of the dam, and the water still runs over on the side next the tan-yard. *M'Coy* did not consider himself injured or interrupted in the enjoyment of his rights by this, for he continued to pay rent regularly without complaint.

(Judge HUSTON denied the fact stated in the fourth reason for a new trial.)

*Hepburn* and *Jones* for the appellee.—The lease to the defendant of 8th *December*, 1821, was nothing more than a reduction into form of a previous agreement. If this was done before the plaintiffs came

(Howell and others *v.* M'Coy.)

into possession, the defendant still retains all the rights he had before the execution of their lease.  The lease recites the former agreement of *February,* 2d, 1814, which was expressly for the purpose of erecting a tan-yard.  The mode of enjoyment prior to and at the execution of the formal lease, was in the contemplation of the parties at the time, and it was necessary to resort to parol testimony to ascertain what were the privileges then enjoyed, the object being to confirm those privileges.  The inconveniences of such an establishment as the defendant's, to those who used the same stream, were fully known to both parties, and if a nuisance then existed, it was incumbent on *M'Call* to reform it.  He did not however think proper to do so, but accepted the rent as a remuneration for the inconveniences he was to sustain.  Water was necessary both for the use of the mill and for other purposes connected with the defendant's business, and the lease provides that it shall be used not only for the mill, but the yard also.  It provides, too, that the water not used in conducting the business shall be returned into the stream.  This provision relates to the quantity of water to be returned, and does not require the defendant to purify it before it reaches the plaintiffs. He is bound to return the surplus water, such as it is, after it has been used in conducting his business.  If it has become contaminated in the process, it is the unavoidable consequence of the object, to which, by the agreement of both parties it was to be applied, and neither has a right to complain.  It is a refinement to say, that the liquid discharged from the vats is not water.  It is water, though impure, and just as valuable to drive a mill, as if it had never been contaminated.  If, instead of returning the surplus water in the state in which it was, it had been withheld, the defendant would have been liable to an action for damages under the covenants in the lease. Had the defendant a right too, to throw his surplus tan into the stream ?  As the premises were let for a tan yard, he had a right to dispose of the tan in some way as an incident to the principal grant. If it was disposed of in the manner the least detrimental to the plaintiffs, they can maintain no action.  The former agreement was the consideration of the lease of *December* 8th, 1821, and all the privileges previously enjoyed, it was the object of that instrument to secure.  From the first establishment of the tan-yard in 1814, the defendant had been in the habit of throwing tan into the tail race. This was absolutely necessary, for if he could not dispose of it in that way, he would have been obliged to relinquish his business, as there was no other mode of disposing of it.  The quantity was too great to be hauled away, and if it had not been, he could not have carried it over the adjoining lands which did not belong to him.  *M'Call,* who owned the property both above and below, knew that it must be disposed of in the manner in which it was, and with that knowledge granted the lease.  It was therefore a privilege springing out of the grant, to the enjoyment of which it was necessary.  He exercised the privilege before the execution of the lease, and continued to do

(Howell and others *v.* M'Coy.)

so afterwards while *M'Call* remained on the premises, and no complaint was made. This practice furnishes a guide to the construction of the lease. *Angell, Appx.* 17. 3 *Starkie on Evid.* 989. 1 *Saund.* 322. *Strickler v. Todd,* 10 *Serg. & Rawle,* 69.

If the plaintiffs have sustained any injury, it has been by their own procurement. They raised their dam, which they ought not to have done. There was an opening or low place in it, until the plaintiffs came into possession, which was left for the purpose of drawing off this offensive matter. By this unauthorised act, the plaintiffs not only created the nuisance to themselves of which they now complain, but by swelling back the water on the defendant's bark mill, they gave him a right of action against them for a nuisance. A tenant has no right to alter the property even by improving it. 3 *Saund.* 259, *note* 11.

The opinion of the court was delivered by

ROGERS, J.—Who, after having stated the substance of the declaration and the plea, proceeded as follows:

The plaintiffs having examined several witnesses in support of the issue, offered to ask a witness whether the water was corrupted and unwholesome; to prove the number of families who depended on this water for domestic purposes; that it was corrupted, so that it could not be used, and that the water was injured for purposes of distillation. The testimony was overruled by the court, and this forms the plaintiffs' first exception, and in this is involved the whole question in the cause. The testimony was overruled, as I conceive, in direct opposition to the case of *Crotzer* v. *Russell,* 9 *Serg. & Rawle,* 82, and *Moore* v. *Houston,* 3 *Serg. & Rawle,* 175. The plaintiff has a right to support his cause of action, by proof of the facts stated in the declaration, and this can only be prevented by a demurrer, which admits the truth of facts, as set forth. The defence, if any he had, whether arising upon license or otherwise, will properly avail the defendant, when the whole case is before the court and jury, by a direction on the law, arising on the facts. In *Moore* v. *Houston,* 3 *Serg. & Rawle,* 175, Chief Justice TILGHMAN says, "If the question were simply whether the judgment of the court of Common Pleas should be reversed or affirmed, there would be but little difficulty in deciding it. If any of the rejected testimony was competent, the judgment cannot stand. And without doubt, part of it was competent, because it was in direct proof of the defendant's plea, and therefore admissible, whether it was matter sufficient in law to bar the plaintiff's action or not. If the plaintiff thought it insufficient to bar him, he might have demurred; but having joined issue, he cannot prevent that from going to the jury, which tends to prove the issue, on the part of the defendant. As, however, this is a motion for a new trial, we would not reverse the judgment of the Circuit Court if the testimony, when admitted, would not give the plaintiff a cause of

(Howell and others *v.* M'Coy.)

action, and this will render it necessary to consider the law, arising as well on the evidence which was rejected, as on that which was admitted by the court.

It is a principle of the common law, that the erection of any thing in the upper part of a stream of water, which poisons, corrupts, or renders it offensive and unwholesome, is actionable. And this principle not only stands with reason, but it is supported by unquestionable authority ancient and modern. It has long since been adjudged, that he, who has a fishery, may maintain an action against a person for erecting a dye-house. 9 *Rep.* 59. *Co. Litt.* 200. *b. Angell on Water Courses,* 59. *Appendix,* 17. *Bealey* v. *Shaw & al.* And if a glover set up a lime-pit, for calf and sheep-skins, so near a water-course, that the lime-pit corrupts it, an action lies. *Angell on Water courses,* 60, and the case there cited. 13 *Hen.* 2, b. 6. The maxim is, *sic utere tuo ut ne lædas alienum.* These positions are recognized by all the writers on the common law, nor have they ever been disputed or denied, in any adjudged case, so far as my researches have extended. The erection of a tan-yard comes within the operation of the same principle, provided it has the effect of which the plaintiffs complain, corrupting and rendering unwholesome, the water in the stream below, used either for distillation, or for culinary or domestic purposes. The general rule of law is, that every man has a right to have the advantage of a flow of water, in his own land, without diminution or alteration in quantity or quality. Nor are we to be understood as saying, that there can be no diminution or alteration whatever, as that would be denying a valuable use of the water. The use of it must be such, as not to be injurious to the other proprietors. Each riparian owner has a right to a reasonable use of the stream, which, of course, will be judged with a regard to public convenience, and the general good. It has been said, that this doctrine may prove injurious to the manufacturing establishments which are rising so rapidly in this country. I do not think so, but if it does, that is no reason why private rights should be infringed, although it may be a strong reason for legislative interference, in providing a mode by which compensation may be allowed to those, whose rights may be affected by an establishment in which the public may be interested.

The limitation of these principles is, either where the appropriation has been for a period of twenty years, which the law deems a presumption of right, or it arises from contract.

I have examined the testimony, with a view to the first question, and there is certainly nothing in evidence which would justify the jury in presuming a grant, so that our attention must be directed to the contract, which the defendant alleges, authorizes him to throw in tan and ross, and to empty the contents of the vats, in the manner stated in the plaintiffs' declaration.

*William M'Call,* under whom the plaintiffs claim, and who was

(Howell and others *v.* M'Coy.)

the proprietor of the property, made a lease of the premises, on the 6th of *December,* 1821, to *Anthony M'Coy,* on which he relies for his justification. From the lease, it would seem that the defendant enjoyed the premises under a parol contract, and the defendant says, the lease was made with a special reference to the manner in which he was accustomed to use the water, and discharge the contents of the tan-yard. Had the defendant sustained this allegation by clear, unequivocal proof, it would have been entitled to great weight in the construction of the lease, as it would have been some evidence of the meaning attached to the contract by the parties themselves. But in this, the defendant has failed. Occasionally throwing in tan, which caused no essential injury, perhaps without the knowledge or observation of *M'Call,* could confer no right, nor is it entitled to much weight in the construction of the lease. The defendant contends for the right to return the water, mixed with whatever greasy, glutinous, unwholesome or poisonous matter it may have acquired in undergoing the process of manufacture, and that the quantity, not the quality of the water, was in the contemplation of the parties to the contract. I cannot agree to this construction. It appears very improbable that the parties could have been so absurd, as not only to permit, but to bind *M'Coy* to return the water into the race, after it had been polluted by intermixture with other substances of a poisonous or unwholesome nature. *M'Coy* contracts for the use of so much of the water of *Martin's* creek, as should be needful and proper for the supply of the tan-yard, and for working a pump therein, and for grinding bark at the mill, with one stone, and no more, and for no other use or purpose whatsoever. And to that end he is authorized to lead and conduct the water of the said creek, out of a dam erected for that purpose, through and along a water-course already constructed, &c. a quantity sufficient for the uses and purposes aforesaid, and in no larger or greater quantity, and in no other or different course or direction, and for no other use or purpose whatsoever : Provided, that all the water which shall be conducted, as aforesaid, to the mill and yard, over and above the quantity which shall be necessarily used and consumed in conducting the business, shall from thence be conducted, without unnecessary and unavoidable loss, diminution, or waste, and returned into the said creek, by a sufficient tail-race, at and above the present mill-dam of the said *M'Call.*

The obvious intention was to prevent any unnecessary waste of water, and for this purpose, care is taken to return the surplus water to the creek from which it was taken, so as to supply the mill of *M'Call,* which was situated on the stream below. It is the water which is not used or consumed, which *M'Coy* stipulates shall be returned to the stream. This contract, like every other, must receive a reasonable construction, and there can be nothing more certain than that they intended what they have clearly expressed, to secure to *M'Call* the surplus water, not necessary in conducting the business

(Howell and others *v.* M'Coy.)

in which *M'Coy* was then engaged.  This is a stipulation which frequently forms part of a contract of this nature, and it is inconceivable to me, that either party could intend, that water, mixed, partly consumed, and of a deleterious and poisonous nature, should be conducted, without unnecessary and unavoidable loss, diminution or waste, and returned into the creek, which is the language used by the contracting parties in this case.  The lease grants liberty to *M'Coy* to take and lead the water of the creek, or so much as shall be necessary for *M'Coy*'s purposes, binding him to lead and discharge the surplus water by the tail-race which had already been constructed.

The defendant further contends, that he is at liberty to make this disposition of the tan, and other matter of the tan-yard, as a right appurtenant to the grant, and for this relies upon *Strickler* v. *Todd,* 10 *Serg. & Rawle,* 69, and 3 *Saund.* 259, and upon the well-established principle, that whatever is necessary to a grant, passes without express words, as an incident.  But as I understand the rule, it must be *necessary* to the enjoyment of the thing demised, not merely convenient; and there is a great difference between what is necessary and what is convenient.  It would, doubtless, be extremely convenient, if *M'Coy* possessed the right asserted by his counsel, of emptying the contents of his tan-yard in the stream below, or disposing of his surplus tan on the land adjoining his yard, but that this is necessary, may well be doubted.  There are various ways of disposing of the surplus matter of his tan-yard, besides the one adopted, and it was for him to consider this, at the time of the lease. The presumption is, he knew the quantity of land which he would require for the successful prosecution of his business, and if he did not choose to purchase more, it is surely not the fault of *M'Call,* or those who claim under him.

The court are of opinion that the plaintiffs have a cause of action, and that a new trial should be awarded.

New trial awarded.