## Crew et al. v. Gallagher et al.

*J. Paul MacElree* and *Hardie Scott*, for plaintiffs.

*John H. Hoffman* and *Nathaniel Richter*, for defendants.

WINDLE, P. J., December 23, 1946.—Plaintiffs in this bill in equity seek an injunction restraining defendants and each of them from using certain real property owned by one of said defendants and by him leased to the other, situate in Willistown Township in this county, as an airport or aviation field or flying field or as a place for the training of student aviators or from using said property as a place for the landing or departure of all aircraft, or from permitting anyone to use said property for any of said purposes. Defendants filed an answer raising issues of fact. The case was duly tried before a chancellor at which much testimony was introduced. Upon the transcription thereof oral argument of counsel was heard. The matter is now ready for adjudication.

### Findings of Fact

1. Plaintiffs, Francis D. Crew and Mary Marsh Crew, his wife, are and have been since March 2, 1943, the owners as tenants by the entireties of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 17.796 acres of land. Thereon is a dwelling house occupied by Mr. and Mrs. Crew and their two small children as their home since August 1945, and a garage. The owners have an investment of approxi-

mately $50,000 in the property. It adjoins the property of defendant Gallagher which is under lease to defendant Krader as hereinafter stated. Mr. and Mrs. Crew acquired their property for a residence where it would be quiet and peaceful in the country. The dwelling is over 600 feet from the highway carrying Federal Route 202 and about 800 feet from the western end of a runway running east and west established and built on the southern portion of the property of defendant Gallagher above mentioned and is due west of the northern portion of said Gallagher property.

2. Plaintiffs, David Dallas Odell and Elizabeth Sewell Odell, his wife, are and have been since May 5, 1945, the owners as tenants by the entireties of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 170 acres of land. It has a frontage on Sugartown Road, a north and south highway, of about 5,000 feet and does not adjoin Route 202. Thereon is a dwelling, farm barn, brooding mare barn, yearling barn, manager's house, garage and an apartment, farmer's house and chicken house. One hundred and forty acres of the ground is planted in blue grass. Mr. and Mrs. Odell maintain their residence there. Their property adjoins the property of defendant Gallagher which is under lease to defendant Krader as hereinafter stated. Mr. and Mrs. Odell acquired the property for the purpose of breeding thoroughbred horses to which use it has been put "always." They have an investment of $100,000 in the realty and $100,000 in personalty including horses. The buildings are located approximately southwest of the Gallagher property.

3. Plaintiffs, Walter G. Allen and Helen L. Allen, his wife, are and have been since October 1, 1945, the owners as tenants by the entireties of a messuage and

tract of land in Willistown Township, Chester County, Pa., consisting of approximately five acres of land. Thereon is a house, barn, garage and dog kennels. Mr. and Mrs. Allen have lived there since October 2, 1945, and are engaged in breeding Kerry Blue Terriers. They have an investment of $35,000 in the realty and personalty, including dogs. The property is on the southwest corner of the intersection of Route 202 and Sugartown Road and is less than one-half mile from the Gallagher property. The buildings are located due west of the northern portion of said property, and are one half mile from the runway on said Gallagher property above referred to. The dwelling is 80 to 125 feet from Route 202.

4. Plaintiffs, Benjamin Allen and Eleanor C. Allen, his wife, are and have been since November 1, 1940, the owners as tenants by the entireties of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 8.633 acres of land. Their property is due east of the northeast corner of said Gallagher property, being physically separated therefrom by a north and south road known as Warren Avenue.

5. Plaintiffs, Thomas J. Gasser and Mildred B. Gasser, his wife, are and have been since June 24, 1927, the owners as tenants by the entireties of a messuage and tract of land in the Borough of Malvern, Chester County, Pa., consisting of approximately 59,-960 square feet of land. Their property is northeast of the said Gallagher property, being diagonally across the intersection of Route 202 and Warren Avenue from the northeast corner of said property.

6. Plaintiffs, Ward Sullivan and Anne Sullivan, his wife, are and have been since March 20, 1944, the owners as tenants by the entireties of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 9.309 acres of land.

Thereon is a home, garage, barn, spring house, pasturage, paddocks and a pond. Mr. and Mrs. Sullivan with their infant son occupy the property. Their purpose in acquiring the property was to get away from the city and have peace and rest. Their investment in the property is between $40,000 and $50,-000. It is between one half and three quarters of a mile from said Gallagher property and is approximately southeast thereof.

7. Plaintiffs, William J. Strawbridge and M. Gwinn Vaux Strawbridge, his wife, are and have been since April 2, 1937, the owners as tenants by the entireties of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 64.506 acres of land. Their property is approximately south of the southeast corner of said Gallagher property.

8. Plaintiff, Malvern Preparatory School, a corporation, is and has been since November 23, 1943, the owner in fee simple of a messuage and tract of land in the Borough of Malvern, Chester County, Pa., consisting of approximately 140.732 acres of land. Thereon is a faculty residence, a dormitory building, regular school building, a gymnasium, barn and a house for the help. There are attending the school operated there over 50 boarding students and 65 to 70 day students who range in age from 13 to 20 and 22 years. The investment in ground and buildings is $301,000. The location is desirable for a school because of its seclusion and quietude. The school has been operated there since 1923, having been, prior to that time, located at Villanova College, Villanova. The nearest building of the school is within a half mile walking distance of the part of the Gallagher property to be used and operated as an airport, being to the north thereof.

9. Plaintiff, Jane Gordon Fletcher, is and has been the owner, since June 18, 1930, in fee simple, of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 273 acres of land. Thereon are nine houses in addition to the mansion house, five barns, garage, chicken house, and other buildings. Its value is between $200,000 and $250,000. Mrs. Fletcher has lived here for 45 years. It is used for farming and the breeding of American Bred saddle horses. It adjoins the Odell property on the west and south, 200 acres lying west of Sugartown Road opposite Odell, and 100 acres lying east of said road and south of Odell. It lies generally southwest of said Gallagher property.

10. Plaintiff, Susan E. Rosengarten, is and has been since February 24, 1936, the owner in fee simple, of a messuage and tract of land partly in Willistown Township, and partly in the Borough of Malvern, Chester County, Pa., consisting of approximately 144.485 acres of land. It adjoins the property of Malvern Preparatory School on the west thereof and the Crew property on the north thereof, being across Route 202 from the latter.

11. Plaintiffs, Joseph C. Morris, Jr. and Anne Lathrop Morris, his wife, are and have been since July 17, 1944, the owners as tenants by the entireties, of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 126.714 acres of land. It is occupied as a residence by Mr. and Mrs. Morris and their small child. The residence is north of Route 202, across that road from the Rush Hospital, hereinafter referred to, although part of the land lies south of said highway, and is about a mile by air line from said Gallagher property, being west thereof.

12. Plaintiff, William C. Hunneman, Jr., is and has been since April 11, 1928, the owner in fee simple,

of a messuage and tract of land partly in Willistown Township, and partly in East Goshen Township, Chester County, Pa., consisting of approximately 83.653 acres of land. It lies southwest of said Gallagher property.

13. Plaintiffs, Edward B. Smith and Frances Paul Smith, his wife, are and have been since September 24, 1936, the owners as tenants by the entireties, of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 131 acres of land. It is three or four miles from said Gallagher property, being east of south thereof.

14. Plaintiff, J. Brooks B. Parker, is and has been since October 15, 1945, the owner in fee simple, of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 62.2087 acres of land. It is south of said Gallagher property.

15. Plaintiff, Frances McN. Vetterlein, is and has been since March 31, 1942, the owner in fee simple, of a messuage and tract of land in East Goshen Township, Chester County, Pa., consisting of approximately 82.955 acres of land. It is west of said Gallagher property and the Morris property above described.

16. Plaintiffs, John O. Platt and Mary Page Platt, his wife, are and have been since January 29, 1926, the owners as tenants by the entireties of a messuage and tract of land in Willistown Township, Chester County, Pa., consisting of approximately 87 acres of land. Thereon is a main house, a cottage, another house, barns and outbuildings. It represents an investment of $125,000. It is about one mile east of said Gallagher property. The purpose in acquiring it was to be in a quiet, pleasant and restful place in the country. Mr. and Mrs. Platt and four children reside there.

17. Plaintiff, Laymen's Week-End Retreat, a corporation, is and has been since 1922, the owner of certain real estate containing more than 150 acres in the Borough of Malvern in this county, close to said Gallagher property. Thereon are three halls given over to the retreat, and the quarters. The league has an investment of over $100,000 in the property. The premises provide a retreat for laymen, the purpose being for one to withdraw and go to a secluded spot for two or three days and renew oneself with faith. It is run under Catholic auspices but anyone is welcome. Last year, 7,578 men took advantage of the retreat. During a retreat, held ordinarily from Friday to Sunday, there are several meditations given by the retreat master, between which the men either go to their rooms or circulate about the grounds meditating in absolute silence. The retreat is a mile and a half from the runway on said Gallagher property and one half mile from the tracks of the main line of the Pennsylvania Railroad. The retreat property at its southern end adjoins Route 202.

18. Plaintiff, Rush Hospital, a corporation, is the owner of certain real estate of 119 acres in this county close to said Gallagher property. Thereon is conducted, and has been since 1901, a convalescent hospital for quiescent tuberculosis. It represents an investment of at least $100,000. It consists of a children's building housing 30 children, a main building with 24 beds, a boys' building with 12 beds, an administration building, four farmers' houses, a dairy barn and cattle barns. It is about one mile west of the Gallagher property. The building nearest to Route 202 is a tenth of a mile therefrom. There are usually an average number of 60 patients at the hospital, which has a capacity of 85. They are compelled to rest and sleep two hours every day during which period of time there is absolutely no noise in the hospital.

Quietude is necessary for the welfare of the patients. The hospital receives financial aid from the State and private contributions to make up the deficit occasioned by patients' inability to pay in full.

19. Plaintiff, E. Barry Ryan, is and has been since May 1, 1946, the owner of certain real estate in this county close to said Gallagher property, containing 93½ acres. Thereon is a main house, guest house, garage, 12 horse stable and smoke house. The investment in the real estate is over $150,000. From the northwest corner of the property to the southeast corner of the Gallagher property is between one half and three quarters of a mile. It is south of the Sullivan property above mentioned. Ryan's business is running and breeding thoroughbred horses and his purpose in buying the property was to establish a breeding farm for such horses in a residential section.

20. Plaintiff, R. Stockton White, is and has been for 10 years, the owner, with his wife, as tenant by the entireties, of certain real estate in this county close to said Gallagher property, containing 187½ acres. Thereon is a main house, another dwelling house, a farm house, a six-car garage with apartment over it, two barns, two large cattle sheds and two chicken houses. Mr. White lives there and has an investment of about $165,000 in the real estate. He purchased the place because he wished to get out in the country where it was more quiet and peaceful than in Devon where he had been living. The property is a mile in an air line from said Gallagher property.

21. Plaintiff, George E. DeCoursey, is the owner of certain real estate in this county close to said Gallagher property. Thereon is a residence which is just over a mile from said Gallagher property. It was bought as a residence for Mr. DeCoursey and his wife.

22. Defendant, Andrew F. Gallagher, is the owner of two certain contiguous tracts of land in Willistown Township, Chester County, containing altogether 238.908 acres. Route 202 adjoins it on the north and Warren Avenue on the east. Sugartown Road, which is approximately parallel with Warren Avenue, lies to the west of it being about one half mile from its western border. Its east and west dimension is about 3,000 feet. A strip extending the width of the property just north of the southern boundary line 700 feet wide is woodland. A part of said property is under lease to defendant, M. R. Krader, being that part bounded by the southern property line and the eastern and western property lines for a distance of 2,800 feet north of said southern property line and containing approximately 193 acres. The northern boundary of the land so under lease is about 660 feet south of and parallel to Route 202.

23. Defendant Krader intends to use said leased premises for the operation of an airport, feeder line, a school of aviation, and other purposes incidental to the operation of an airport, including landing fields, runways and all the other incidents accompanying and essential to the operation of such an airport. Privately owned airplanes will be cared for in hangars to be built for that purpose, there being room to provide accommodations for 50 such planes, and possibly 100 if the woods were removed. Krader purposes also to maintain an agency for the sale of airplanes and provide instruction in flying to prospective purchasers. The field would be primarily a base for private fliers. No flying at night is contemplated except in emergencies. Airplanes of various sorts and kinds will be received, stored, repaired, tested and furnished with supplies.

24. Just north of the strip of woodland at the southern end of said Gallagher property defendant Krader

has located a runway extending 3,000 feet due east and west. Although not entirely completed it is usable. Another runway is partially built extending diagonally across the property, beginning at Warren Avenue and running "200 degrees south." When eventually finished it will run into the woods and be 2,800 feet long.

25. In teaching one to fly 25 percent of the first 40 or 50 hours of such instruction is devoted to taking off and landing.

26. The prevailing winds at said Gallagher property are from the west.

27. Airplanes ordinarily take off and land up wind.

28. The contemplated "flight pattern" for the airfield provides that planes leaving the field toward the west make a left turn toward the south at 400 feet and fly down Sugartown Road. They make another left turn between the Fletcher house and Odell house and fly east, until opposite the point where they expect to land, where they execute two more left turns, the last one bringing them over the runway. Planes leaving the airport toward the east make a right turn toward the south at 400 feet. A stranger approaching the airport would not know the flight pattern unless he had read of it in a publication issued for the information of aviators, there being as yet no means of communicating with them in the air from this airport.

29. An airplane of the type owned by Krader that has been flying in and out of said airport, to wit, a "Fairchild," ascends one foot in every seven feet forward. It would take off in 700 or 800 feet.

30. The main line of the Pennsylvania Railroad running generally east and west is about one mile to the north of said Gallagher property.

31. Route 202 is a main traveled or through traffic highway, carrying much motor vehicular traffic, including both trucks and pleasure cars.

32. Commercial transport planes frequently pass overhead at much higher altitudes than planes using said airport.

33. The section surrounding the said Gallagher property is country residential in character. Little agriculture is carried on. Many of the property owners use their places as residences only, others engage in breeding horses and dogs. Some of the land is farmed but more as an avocation than as a vocation. Some of it is given over to a boys' preparatory school, a retreat and a convalescence hospital, none of them out of place or inappropriate in a country residential district or, located as they are, materially altering the residential character thereof. There is a public picnic ground across Route 202 to the north, and a manufacturing plant in Malvern.

34. Until planes began to fly in and out of said airport plaintiffs enjoyed the uninterrupted peace and quiet of their properties and estates, subject only to the noises usually incident to country life in this era. The noises of trains on the railroad, motor vehicular traffic on the highways and commercial transport planes overhead were not objectionable to plaintiffs. That any noise emanates from the manufacturing plant or picnic ground does not appear.

35. The operation of the airfield by defendant Krader on said property of defendant Gallagher as contemplated will certainly and inevitably cause hurt, inconvenience and annoyance to the reasonable enjoyment of the lands and hereditaments of plaintiffs, and will certainly and inevitably annoy and disturb plaintiffs in the possession of their properties, rendering the ordinary use and ocupation thereof physically uncomfortable to plaintiffs.

*Discussion*

That the facts found as above are properly established by the evidence there can be no doubt. Many of them are admitted and others were testified to in so many words by entirely credible witnesses. The last one is, in part at least, established by testimony, admitted without objection, as to flights made by planes emanating from and landing in the airfield in question subsequent to the filing of this bill but before trial. If the comparatively few flights made during that period caused the inconvenience and interference with the reasonably-to-be-expected quiet enjoyment of plaintiffs' properties described and stated to have been caused thereby it follows irresistibly that with the field in full operation as contemplated the annoyance to plaintiffs caused thereby would be very severe. Such flights furnish ample evidence of what might be expected if the airfield were in full operation as planned. Clearly plaintiffs living near the field, especially to the west thereof, would be subjected to the noise and hazards of low flying planes taking off frequently during the daytime at least—and the Rush Hospital, the proper and reasonable operation of which requires absolute quiet for two hours each afternoon, is due west of the field and but one mile distant. It cannot be doubted that the reasonable and proper operation of the Malvern Preparatory School as well as the Laymen's Week-End Retreat would be adversely affected by the noise of the planes and that the quiet enjoyment of their homes and properties by nearby residents reasonably-to-be-expected in such a community would be seriously interfered with, to say nothing of the entirely proper vocations and avocations of breeding thoroughbred horses and dogs and raising chickens. Careful consideration and evaluation of all the testimony compels said finding of fact.

The question here arises when the law in regard to private nuisances is applied to the facts as found.

The language used by this court in Gay et al. v. Taylor et al., 19 D. & C. 31, 34, even though in the year 1933, is entirely appropriate and apposite here, as follows:

"The industry or art of aviation is, of course, in a state of development. It is desirable that every proper aid and assistance to the growth and betterment thereof be given in order that it may fulfill its promise to the commerce of the country in time of peace and to national defense in time of war. However, until legislative bodies have conferred such powers on them, those engaged in that industry are no more privileged to infringe on the rights of others than anyone else and they must be held to the same rules of conduct in their operations as individuals engaged in different and less glamorous pursuits. As sympathetic as we may be to foster and develop this new science, we may not confer upon it and its followers authority to do things not permitted in others. That may be done by the legislature but not by the courts, and until the former body has acted, the latter are unable to enlarge the powers referred to. Consequently, the defendants here are endowed with no special privileges merely because they are engaged in operating an airport and in that light have we considered them. . . .

"A nuisance is 'anything which causes hurt, inconvenience or annoyance to the lands, tenements or hereditaments of another, or to the reasonable enjoyment of the same': Wallace, Trustee, v. Auer, 10 Phila. 356; or 'that which annoys and disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable to him': Tuckachinsky v. Lehigh & Wilkes-Barre Coal Co., 199 Pa.

515. It has also been defined as 'anything that unlawfully hurts, annoys or causes inconvenience to another': Crawford v. Atglen Axle & Iron Mfg. Co., 1 Chest. Co. R. 412. As an airport is not a nuisance per se the operation thereof must come within the terms of the above definitions before it can be classed as a private nuisance as plaintiffs here seek to have done."

Plaintiffs' contention is, first, that an airfield operated where and as is here contemplated will be a nuisance per se; second, that if it be not a nuisance per se it is and will be a nuisance in fact; and that in either event it is restrainable at the instance of some or all of the plaintiffs. The noise made by low flying planes is the principal thing to which their testimony is directed as constituting a nuisance, but at least one plaintiff testified as to the hazards of such aircraft. Defendants contend that their airfield will not be a nuisance per se; that it will not be a nuisance in fact (because, inter alia, the noise of airplanes attracted to the community thereby is not materially greater than the noise already heard there from other sources) and that, because aviation is of such importance in the development of the country, this airfield should be held not to constitute a restrainable nuisance in any event—that the private rights of plaintiffs should be subordinated to the public good. They presented no testimony tending to negative the existence of the hazards described by one plaintiff on the witness stand. We have concluded that the airfield is, and will be, a nuisance in fact and restrainable as such.

Defendants presented the results of sound tests made at various points near the field seeking to prove that if plaintiffs were not annoyed by the noise of transport planes and trucks passing on Route 202

they should not and would not have been annoyed by the noises of the low flying planes that were here complained of, thus attacking the credibility of the witnesses who testified that they were in fact so annoyed. Much of that testimony is of little help in that regard but giving it all the weight we think it should receive and considering all the testimony on the subject, including the statements of the witnesses they were in fact so annoyed, we have resolved the questions of credibility and have come to the conclusion that said witnesses were annoyed and that reasonably proper uses of their properties were interfered with by said planes.

The argument, closely akin to the above and to some extent supported by the tests above referred to, that the "second level" of the neighborhood is even now such that the noise caused by the contemplated operation of this airfield would not constitute a nuisance is of no help to defendants. We cannot find that that is so. The noises already commonly heard at the properties of plaintiffs are such as might be expected in these times in a community of the kind under consideration and are not so loud or of such a nature or duration as to be objectionable, according to the testimony. (The only testimony that the noise of trains on the Pennsylvania Railroad was objectionable came from the lips of the defendant Krader who stated that, when the wind was in the north, the sound of freight trains on that railroad was "terrific." There was no testimony that the manufacturing plant in Malvern made any noise at all—what is manufactured there does not appear—or that the picnic ground, boys' school, or any of the other operations carried on in the community did so. And the noise of motor traffic on Route 202, high flying commercial transport planes and tractors used in the cultivation of plain-

tiffs' acres, it was testified, was not of sufficient volume to prove annoying.) And equally according to the testimony the noises made by the planes so far operated from the field have actually caused annoyance and interference with the proper quiet enjoyment of the properties in question. Clearly the anticipated flights of planes in and out of the field when it is in full operation would all the more cause such annoyance and interference. It is futile to say that one would not be annoyed or interfered with in the proper quiet enjoyment of one's property by noise when by reason thereof one would have to discontinue a telephone conversation in one's dwelling and could not hear ordinary conversation, when the attention of pupils in a school would be distracted, when the rest of patients in a hospital would be broken, when the meditations of those who have repaired to a place in the country established for that very purpose would be interrupted, and when domestic animals would be frightened and the breeding of live stock and raising of chickens would be interfered with. All of the latter mentioned enterprises are properly carried on in the country community in question. They are not out of place and may reasonably expect the quiet of the countryside that they have come there to seek. Their owners and operators are not insisting "upon a degree of quietness" not "consistent with the standard of comfort prevailing in the locality in which" they live: Collins v. Wayne Iron Works, 227 Pa. 326, 331.

In addition to the noise above referred to the hazards of low flying aircraft was pointed to in his testimony by one plaintiff, an experienced military pilot, as another source of annoyance and interference with the proper quiet enjoyment of one's property. He owns a dwelling and raises chickens "just over half a mile" from the airfield. When those hazards and the apprehension thereof are considered along

with the element of noise all the more is it obvious that planes flying into and out of this airfield would annoy and disturb plaintiffs, or some of them, in the possession of their properties, and render the ordinary use and occupation thereof physically uncomfortable.

From what has been said above it is obvious that the contemplated operation of this airfield will inevitably constitute a private nuisance in fact whether or not it will be a nuisance per se as that term is used by our courts. In addition to the definitions of private nuisance in Gay et al. v. Taylor et al., supra, above quoted, the A. L. I. Restatement of the Law, Torts, ch. 40, says that "Private nuisance is properly an interference with the use and enjoyment of land, and is a wrong . . . to persons who have property rights or privileges in the land." The rights of property owners to the quiet enjoyment and proper use of their land is recognized by The Aeronautical Code of May 25, 1933, P. L. 1001, which at section 402, provides as follows:

"Flight in aircraft over the lands and waters of this Commonwealth is lawful, unless at such low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water, is put by the owner, or unless so conducted as to be dangerous or damaging to persons or property lawfully on the land or water beneath."

It appears therefore that the provisions of that section will undoubtedly be violated and repeated trespasses committed on the properties of at least some of the plaintiffs, upon which ground an injunction might be sought. That such quiet enjoyment and use of plaintiffs' lands will certainly be interfered with by the contemplated operation of this airfield cannot, under all the evidence, be doubted and we hold that it will be.

Counsel argues that the interests of defendants sought to be advanced must be compared with the burden and inconvenience that will be imposed upon plaintiffs in determining whether a restrainable nuisance exists or will inevitably ensue. However, the decision of our Supreme Court in Evans v. Reading Chemical Fertilizing Co., Ltd., 160 Pa. 209 negatives that view, holding that only is that so when a preliminary injunction is sought and that "where, upon final hearing the mind of the chancellor is satisfied that the complainant's right is clear, and the injury sustained by him substantial, so that his claim to damages at law is indisputable, and where, moreover, such damages could not give him adequate redress except by an endless repetition of suits, a refusal of an injunction, upon the ground that plaintiff cannot suffer as great a loss from the continuance of the nuisance as defendant would from its interdiction, would be as far removed from equity as can be." In that case a fertilizer manufacturing plant located in the open country in a "populous farming district" in Berks County in this State was enjoined at the instance of a neighboring farmer on account of the noxious odors and gases which emitted from it. Judge Endlich wrote the full and comprehensive opinion of the lower court and the decree of that court was affirmed by the Supreme Court for the reasons given in said opinion. Much of the language is apposite here but we see no good reason in quoting it herein more at length than we do. We do not find that the principles stated in the above quotation and the one hereinafter set forth have ever been overruled by any later decisions of our appellate courts and the case has been cited by the Supreme Court as an authority as late as 1942 in Bethlehem v. Druckenmiller et ux., 344 Pa. 170. We accordingly hold that the balancing of injury as between plaintiffs and defendants may not

be considered in this present application. See also Quinn v. American Spiral Spring & Mfg. Co., 293 Pa. 152.

The same is true as respects the similar argument that the interests of the public must be considered in this present application. Evans v. Reading Chemical Fertilizing Co., Ltd., supra, definitely holds to the contrary, the opinion saying (p. 225) : "So far as this doctrine refers to the interest of the public, its significance, as shown by the circumstances under which it has been applied, is exhausted, except in applications for preliminary decrees by the rule already stated concerning the duty of the individual to subordinate his personal preferences to the necessities of the community in which he lives, and for its good to put up with those 'mere trifling annoyances or injuries' referred to in Price v. Grantz, 118 Pa. 402, 413, which consist solely in personal inconvenience. I have not been able to find a case in which substantial injuries to property rights, to the rights of enjoying and possessing property, have been sanctioned by a final refusal to enjoin, on the mere ground that the public was interested in their continuance. Such an appeal was made in Broadbent v. Gas Co., 7 De.G.M. & G. 436. It was said that the undoubted injury inflicted upon the plaintiff's property was slight in comparison with the manifest benefits conferred by the company on the public, and on that account the court ought not to exercise its powers to restrain the manufacture of gas. But Lord Cranworth said: 'I have come to the conclusion that I cannot enter into any question of how far it might be convenient for the public that the gas manufacture should go on,' adding that in the face of substantial continuing damage, to deny an injunction upon such a ground and remit the plaintiff to an action at law toties quoties, 'would be a disgraceful state of the law.' The judgment in

this case was affirmed on appeal: 7 H.L. Cas. 601. No better has the argument fared in our Supreme Court, when asserted in justification of injuries to property rights. 'A person cannot,' says Mr. Justice Gordon in Pa. Lead Co.'s Ap., ubi supra, 'claim immunity . . . on the ground that . . . his trade is a useful one and beneficial to the community or to the nation, or that by bringing a large number of workmen into the community it has enhanced the value of the plaintiff's property.' 'There are many trades and many occupations which are not only reasonable but necessary to be followed, and which still cannot be allowed in the proximity of dwelling houses so as to interfere with the comfort of their inhabitants:' Jessel, M. R., in Broder v. Saillard, L.R. 2 Ch. D. 692, 701, quoted and approved in Ladies' Decor. Art Club's Ap., 12 Cent. R. 377. The public usefulness of an enterprise 'is no reason why private right should be infringed:' Rogers, J., in Howell v. McCoy, 3 Rawle, 256, 269."

Consequently in arriving at our findings and conclusions herein we have given no consideration to the interests of the public in advancing the cause of aviation, as we believe, under the law as it now exists, we have no right to do. The evidence offered bearing on that phase of the matter was properly excluded at the trial by the chancellor. See also Quinn v. American Spiral Spring & Mfg. Co., supra.

As above indicated, we believe that, as held in Gay et al. v. Taylor et al., supra, one operating an airfield or airport has no greater right or license to commit a private nuisance than anyone else, under the law of this State as we understand it to be. If any change is to be made in that regard it is not within the province of the courts to make it. Courts do not legislate. We consequently conclude that the prayer of this bill must be granted and the injunction prayed for must issue. In a similar case, Dlugos v. United

Air Lines, 53 D. & C. 402, 20 Lehigh 411, the chancellor came to the same conclusion and there granted a preliminary injunction after hearing on a rule to show cause.

### Conclusions of Law

1. The contemplated use of the premises owned by defendant Gallagher in Willistown Township, Chester County, Pa., and by him leased to defendant Krader, as an airfield, airport, or flying field will certainly and inevitably be a nuisance to plaintiffs.

2. Plaintiffs are entitled to the relief they seek.

3. An injunction restraining the use of said premises as an airfield, airport or flying field must be granted.

The following will be entered as a final decree unless exceptions thereto are filed within 10 days after notice of the entry thereof has been given by the prothonotary to counsel of record.

### Decree

And now, December 23, 1946, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

The operation of an airport, airfield or flying field or as a place for the training of student aviators or as a place for the landing or departure of aircraft on the property of defendant Andrew F. Gallagher, situate in Willistown Township, Chester County, Pa.; is hereby enjoined. Both defendants are hereby restrained from using said property or permitting it to be used as an airport, airfield, flying field or as a place for the training of student aviators or as a place for the landing or departure of aircraft and from permitting or carrying on thereon any operation incident to such use of said property.

The cost will be paid by defendants.